FRANCISCO CRUZ, menor representado por su madre con patria potestad, ALEJANDRINA FRANCO, demandante y apelante, *v.* CENTRAL PASTO VIEJO, INC., demandada y apelada.

No. 5599.—*Sometido:* Mayo 6, 1932.—*Resuelto:* Enero 11, 1933.

*Arturo Aponte* y *F. Gallardo Díaz,* abogados del apelante; *W. L. Newsom, Jr.,* y *J. Henri Brown,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

En la demanda enmendada que sirve de base a esta acción se alegan los siguientes hechos:

Que el demandante Francisco Cruz es un niño de nueve años de edad, huérfano de padre, estando representado en esta acción por su madre con patria potestad, Alejandrina Franco, vecina de Humacao, siendo la demandada, Central Pasto Viejo Inc., una corporación organizada de acuerdo con las leyes de Puerto Rico, teniendo su domicilio legal dentro del distrito judicial de Humacao.

Que el día 4 de mayo de 1928, así como antes y después de dicha fecha, la demandada era dueña de una finca de cañas denominada Colonia "Mulas", situada en la municipalidad

de Humacao, siendo dueña asimismo de las plantaciones, bueyes, carros e implementos de labranza utilizados por ella como parte de su negocio lucrativo de siembra, molienda y manufactura de azúcar de caña.

Que el demandante nació el día último de junio de 1918 y el día 4 de mayo de 1928, estando trabajando al servicio de la demandada en el oficio de dar "rabo" u hojas de cañas a los bueyes de la demandada mientras dichos bueyes estaban uncidos a los carros destinados a transportar las cañas cortadas y en el oficio de recoger las cañas que se cayeran de los carros durante el acarreo, ganando un jornal de $0.50 diarios en la mencionada finca "Mulas", y debido a la negligencia de la demandada, se volcó uno de los carros mencionados, cayendo parte del mismo sobre el cuerpo del demandante, fracturándole el cráneo e hiriéndole gravemente, a consecuencia de lo que hubo de ser recluído en un hospital por algunos meses, sufriendo intensos dolores físicos y angustias mentales, perdiendo la visión natural de sus ojos, quedando parcialmente paralítico y quedando permanentemente inútil para todo trabajo.

Que dicho menor fué empleado de dicha corporación sin habérsele exigido el certificado requerido por la ley, no siendo su madre inválida ni su padre tampoco, ni dependiendo ellos del demandante para su subsistencia.

Que la demandada ha causado daños y perjuicios al demandante por la suma de $50,000 que son los que se reclaman en esta acción en concepto de daños y perjuicios, más las costas.

Esta demanda fué contestada por la demandada Central Pasto Viejo Inc., aceptando el hecho primero de la misma, que se refiere a la capacidad de las partes, y el segundo en lo que se refiere a que la demandada, en 4 de mayo de 1928, era dueña de la finca denominada Colonia "Mulas" y de las plantaciones de caña, bueyes, carros e implementos de labranza utilizados por ella como parte de su negocio lucrativo de siembra, molienda y manufactura de caña, pero se alega

que el menor Francisco Cruz, el día en que ocurrió el supuesto accidente no se encontraba trabajando al servicio de la corporación demandada, ni de ninguno de sus administradores, ni empleados, y que el accidente ocurrió por haber ordenado el padre de dicho menor, el Sr. Raimundo Cruz, al menor demandante que se trasladara a otra de las colonias que es propiedad de la demandada, ordenándole que se montara en uno de los carros que iba para el referido lugar, y que con tal motivo y a consecuencia de haberse volcado el carro, sufrió el menor demandante varias contusiones en el cuerpo, de las que fué curado en el Hospital Presbiteriano de Humacao.

; Como materia nueva de defensa y de oposición a la demanda enmendada, la demandada alegó que por escritura número 115 de fecha 2 de junio de 1928, otorgada en Humacao, P. R., por Raimundo Cruz, padre del menor demandante Francisco Cruz, y actuando como padre con patria potestad sobre su menor hijo aquí demandante, y don Fernando Margarida en su carácter de vicepresidente de la corporación demandada, celebraron un convenio de transacción, por virtud del cual don Raimundo Cruz, en su carácter de padre con patria potestad sobre el menor demandante, exoneró de toda responsabilidad directa o indirecta a la corporación demandada con motivo del accidente ocurrido a su menor hijo Francisco Cruz, y recibiendo por virtud del expresado convenio de transacción la suma de $450 como justa compensación por todos los daños y perjuicios que pudieran reclamarse contra la corporación demandada, con motivo del accidente mencionado, y en adición a la expresada suma, la corporación demandada se obligó asimismo a pagar todos los gastos de estadía en el Hospital Presbiteriano de Humacao, del referido menor demandante, por todo el tiempo que tuviera necesidad de estar recluído en el referido hospital, a consecuencia de las lesiones recibidas en el accidente mencionado, todos cuyos gastos fueron pagados por la corporación demandada, y que ascendieron a la suma de $40.

Que la corporación demandada no ha tenido intervención directa ni indirecta en el accidente del menor demandante, siendo la causa inmediata de la misma la negligencia del padre del demandante, Sr. Raimundo Cruz, quien ordenó a su menor hijo que se montara en uno de los carros que se dirigían hacia una de las colonias propiedad de la corporación demandada.

Celebrado juicio y declarada sin lugar la demanda, el demandante interpuso el presente recurso de apelación.

Basa su fallo la corte inferior en el convenio celebrado por la demandada con Raimundo Cruz, en representación de su hijo menor, el cual, según dicha corte, constituye una transacción y tiene el carácter de cosa juzgada. Copiamos a continuación el mencionado contrato:

"NÚMERO QUINCE.—CONVENIO DE TRANSACCIÓN.—En la ciudad de Humacao, Isla de Puerto Rico, a los dos días del mes de junio de 1928,—ANTE MÍ,—JOAQUÍN VENDRELL JOUBERT, abogado y notario público, con residencia en la ciudad de Caguas y estudio abierto en la calle Gautier Benítez de la misma, asistido de los testigos que al final se expresarán:—COMPARECEN:—De una parte, DON RAIMUNDO CRUZ, mayor de edad, casado, jornalero y vecino de esta ciudad, en representación como padre con patria potestad sobre su menor hijo FRANCISCO CRUZ.—Y de la otra parte, DON FERNANDO MARGARIDA, mayor de edad, casado, Ingeniero Químico y vecino de Caguas, en su carácter de Vice-presidente de la Central Pasto Viejo Inc., que es una corporación organizada con arreglo a las leyes del país, con oficinas principales en la ciudad de Caguas, registrada en la oficina del Secretario Ejecutivo de Puerto Rico y autorizada para hacer negocios en esta Isla.—Yo, el Notario, doy fe del conocimiento personal de los comparecientes, así como por sus propias manifestaciones de su edad, estado, profesión y vecindad.—Aseguran tener y tienen a mi juicio la capacidad legal necesaria para este otorgamiento sin que me conste nada en contrario y libremente EXPONEN:

"PRIMERO.—Manifiesta don Raimundo Cruz que desde hace algún tiempo viene trabajando con la Central Pasto Viejo por medio de ajustes en el deshierbo y cultivo de las plantaciones de cañas que se hallan en la finca denominada "Mulas", propiedad de la corporación Central Pasto Viejo Inc., y que ha venido utilizando a su hijo el menor

Francisco Cruz como aguador para distribuir el agua a los trabajadores que utilizaba el referido Raimundo Cruz en los deshierbos.

"SEGUNDO.—Que posteriormente y a consecuencia de haberse terminado este trabajo uno de los mayordomos de la colonia 'Mulas' llamado Luis Rivera ordenó a dicho Raimundo Cruz que fuera a trabajar en el bombeo de cañas en un carro que hay en la colonia llamada Mulas.

"TERCERO.—Que con el fin de utilizar el compareciente a su hijo menor Francisco Cruz, le ordenó a éste para que se dedicara a darle rabos de caña a los bueyes.

"CUARTO.—Que inmediatamente el niño Francisco Cruz, hijo del compareciente don Raimundo Cruz, montó en uno de los carros tirados por bueyes que iba hacia el cerro, con tan mala suerte que el carro se volcó, resultando el niño con una fractura en el cráneo y a consecuencia de este accidente hubo que llevarle al Hospital Presbiteriano de Humacao, donde se encuentra en la actualidad recluído bajo tratamiento médico, gastos que bondadosamente se están haciendo por cuenta de la Central Pasto Viejo.

"QUINTO.—Que en este accidente no ha tenido intervención directa ni indirecta ninguno de los empleados de la corporación Central Pasto Viejo Inc., y que el trabajo que estaba realizando el hijo del compareciente don Raimundo Cruz fué por mandato del compareciente don Raimundo Cruz, padre del menor Francisco Cruz.

"Y habiendo convenido los comparecientes Raimundo Cruz como padre con patria potestad sobre su menor hijo Francisco Cruz, y don Francisco Margarida, en su carácter de Vicepresidente de la Corporación Central Pasto Viejo Inc., en celebrar un convenio de transacción, al efecto por las siguientes cláusulas, OTORGAN:

"A.—Que con el fin de ayudar al compareciente don Raimundo Cruz por la desgracia ocurrida a su hijo Francisco Cruz en momentos en que estaba obedeciendo órdenes de dicho compareciente Raimundo Cruz, la Corporación Central Pasto Viejo Inc., por conducto de su representante el compareciente don Fernando Margarida le ha ofrecido a dicho compareciente don Raimundo Cruz la suma de CUATROCIENTOS CINCUENTA DÓLARES que el dicho compareciente don Raimundo Cruz acepta gustoso y cuya cantidad recibe en este mismo acto y en mi presencia en un cheque por igual suma expedido bajo el número 1983 a favor y orden de dicho Raimundo Cruz contra The National City Bank of New York, Caguas Branch, por lo que otorga a favor de la corporación Central Pasto Viejo la más eficaz carta de pago.

"B.—Que aunque la corporación Central Pasto Viejo Inc. por medio de sus empleados ni por ninguna otra persona en su nombre no ha tenido responsabilidad directa o indirecta en el accidente ocurrido a su menor hijo Francisco Cruz; y con el propósito de evitar cualquier litigio que pudiera sobrevenir con motivo de este accidente, la cantidad aquí consignada y entregada al Sr. Raimundo Cruz en su carácter de padre con patria potestad sobre su menor hijo Francisco Cruz, se entenderá como una justa compensación por todos los daños y perjuicios que pudieran reclamarse contra la referida corporación con motivo del accidente referido, y al efecto el compareciente don Raimundo Cruz como padre con patria potestad sobre su menor hijo Francisco Cruz, se obliga a no iniciar ninguna acción contra la corporación Central Pasto Viejo Inc., con motivo de dicho accidente, por entender que la cantidad aquí recibida cubre cualquier perjuicio que pudiera reclamar en representación de su menor hijo con motivo del referido accidente.

"C.—La corporación Central Pasto Viejo Inc. en adición a la cuantía aquí pagada por vía de indemnización de daños y perjuicios, se obliga asimismo a pagar todos los gastos que se originen por la asistencia médica, medicinas y gastos de estadía en el Hospital Presbiteriano de Humacao durante todo el tiempo que el menor Francisco Cruz tenga necesidad de estar recluído en el mencionado Hospital Presbiteriano por el accidente referido.

"D.—Manifiestan el compareciente don Raimundo Cruz y el compareciente don Fernando Margarida que el menor Francisco Cruz no estaba empleado ni trabajaba por cuenta de la corporación Central Pasto Viejo Inc., en el día en que ocurrió el accidente.

"Las partes aceptan esta transacción por ser conforme a lo convenido.

"Y yo el notario hice a los otorgantes las advertencias legales pertinentes por este acto.

"Así lo dicen, otorgan por ante mí y los testigos presentes, mayores de edad, sin tacha legal para serlo y vecinos de esta ciudad, según aseguran don Cruz Pérez y don Marcos Ojeda.

"Leída esta escritura a otorgantes y testigos porque renunciaron el derecho de leerla por sí, del que les advertí, hallándole conforme, la ratifican los otorgantes y la firman todos ante mí, que de todo cuanto en la presente se consigna, yo, el Notario, doy fe.—Raimundo Cruz.—F. Margarida.—Cruz Pérez.—Marcos Ojeda.—Signado, y firmado, Joaquín Vendrell, Notario Público.—Hay cancelados sellos de rentas internas por valor de un dollar y el de la notaría.

"Concuerda bien y fielmente con el original de su contenido a que me remito. En fe de ello y a pedimento de la Central Pasto Viejo Inc., libro la presente copia que firmo, sello y signo en Caguas, Puerto Rico, hoy día de su otorgamiento.—Joaquín Vendrell, Notario."

El documento que antecede fué firmado por las partes en 2 de junio de 1928. Con anterioridad a esta fecha, o sea el 24 de mayo del mismo año, la corporación demandada compareció ante la Corte de Distrito de Humacao, solicitando su aprobación a un convenio de transacción celebrado por la demandada con Raimundo Cruz, padre del menor Francisco Cruz, con motivo del accidente que sufrió este último el día 4 de mayo de 1928. En este convenio la corporación demandada ofrece $450 a Raimundo Cruz, que éste acepta como una justa compensación por todos los daños y perjuicios que pudieran reclamarse contra la mencionada corporación con motivo del accidente referido. La corte de distrito celebró una vista sobre esta solicitud de aprobación judicial, con intervención del fiscal y del abogado F. Gallardo Díaz, quien compareció como interventor. El fiscal y el Sr. Gallardo se opusieron a la solicitud y la corte se reservó su resolución. Mientras tanto las partes, sin esperar la resolución de la corte, celebraron el convenio que se alega como materia nueva en la contestación a la demanda.

La primera cuestión a considerar es si Raimundo Cruz tuvo o no autoridad para transigir los derechos que hubiere podido tener su hijo contra la corporación demandada, prescindiendo de la aprobación judicial.

La transacción es un convenio mediante el cual dos o más personas evitan la provocación de un pleito o ponen término al que había comenzado. Toda transacción envuelve concesiones recíprocas para evitar o terminar un litigio y resolver definitivamente un estado de incertidumbre de las partes sobre una relación de derecho. "La capacidad para transigir", dice Manresa, "está condicionada por la capacidad para disponer de los bienes, puesto que," según dicho comen-

tarista, "las mutuas concesiones de las partes equivalen a actos de enajenación."

Con respecto a la capacidad de los representantes legales de un menor para transigir sobre los bienes y derechos de éste, el Código Civil establece ciertas diferencias entre las facultades que se conceden al tutor y aquéllas que se conceden al padre. El tutor necesita la autorización expresa de una corte de distrito para transigir y comprometer en árbitros las cuestiones en que el menor estuviere interesado, mientras que el padre, o en su caso la madre, puede transigir sobre los bienes y derechos del hijo que estuviere bajo su patria potestad, con la salvedad de que la transacción no surtirá efecto sin la aprobación judicial, cuando el valor del objeto sobre que recaiga exceda de $500. "El fundamento legal de dicha diferencia", dice Manresa en el tomo 12, página 107, de sus Comentarios al Código Civil Español, "estriba en la mayor confianza que al legislador ha debido y debe merecer siempre el interés que por los hijos tienen en todo tiempo los padres, y por eso los faculta para transigir sobre sus bienes y derechos cuando el valor de los que sean objeto de la transacción tenga tan corta importancia que no exceda del tipo fijado por la ley, pues pasado éste necesitarán la autorización judicial, porque sin ella no podrá surtir efecto alguno."

De acuerdo con el artículo 159 del Código Civil, edición 1930, el ejercicio de la patria potestad no autoriza al padre ni a la madre para enajenar o gravar bienes inmuebles de clase alguna o muebles cuyo valor exceda de $500 pertenecientes al hijo, y que estén bajo la administración de aquéllos, sin autorización de la corte de distrito en que radican los bienes, previa comprobación de la necesidad o utilidad de la enajenación o el gravamen. De acuerdo con el inciso quinto del artículo 212 del Código Civil, edición 1930, el tutor necesita autorización de la corte de distrito competente para enajenar o gravar bienes inmuebles que constituyan el capital de los menores o incapaces, o hacer contratos o actos

sujetos a inscripción, así como para enajenar bienes muebles, cuyo valor pase de $200. La doctrina que prevalece en Estados Unidos concede al tutor facultades más amplias que al padre en su carácter de tal, sobre los derechos y bienes de los menores. El padre, por ejemplo, en su carácter de tal, no puede, en ausencia de un estatuto que así lo disponga, transigir reclamaciones en favor o en contra de su hijo. El tutor o guardián, en ausencia de una disposición restrictiva, está autorizado para transigir reclamaciones existentes en favor de su pupilo siempre que actúe de buena fe. Los estatutos de algunos estados, sin embargo, reservan a las cortes la facultad de autorizar las transacciones, y bajo estos estatutos el tutor no puede transigir sin haber obtenido autorización judicial. En el estado de Louisiana se necesita la autorización del consejo de familia. Las facultades que se reconocen al tutor, en ausencia de disposiciones restrictivas, se basan en que éste es en realidad un brazo de la corte a cuya autoridad se somete en el desempeño de sus funciones. El tutor es un comisario o "trustee" que responde de la fiel ejecución de sus deberes y de todos los bienes que pertenezcan a su pupilo y caigan bajo su dominio o control. El padre es el guardián natural de la persona del hijo y debe ser preferido sobre cualquier otra persona para el nombramiento de tutor general, lo mismo que la madre en caso de que haya muerto el primero. Esta es la regla general de la jurisprudencia, a menos que existan razones poderosas para prescindir de los padres como cuando así lo requieren el bienestar y la felicidad del menor. Cuando el padre se convierte en tutor, tiene, como es natural, las mismas facultades que un tutor general sobre los derechos y bienes de sus hijos.

En el estado de Minnesota, donde la ley concede al padre el derecho de promover una acción por daños ocasionados al hijo, se ha sostenido que el padre está autorizado para transigir, pero la Corte Suprema de dicho estado dice que este estatuto ha sido sostenido contra objeciones constitucionales

por tratarse al padre como un comisario legal (*statutory trustee*). *Hannula* v. *Duluth*, 130 Minn. 3, 153 N. W. 250. Y en el caso de *Picciano* v. *Duluth, etc. R. Co.*, 102 Minn. 21, 112 N. W. 885, resuelto por la misma corte, se dice que habiéndose creado por el estatuto una relación de comisaría (*trusteeship*), la corte retiene jurisdicción de la materia y del comisario, y que las negociaciones de éste, con respecto al menor, pueden ser revisadas en cualquier tiempo por justa causa cuando lo requiera la protección del menor.

La Corte de Minnesota, teniendo en cuenta la relación creada por la ley, no impone limitaciones al padre para transigir, por razón de la cuantía, en un caso comprendido dentro del estatuto. Nuestro Código Civil establece la regla general de que la transacción no surtirá efecto cuando el valor del objeto sobre que recaiga exceda de $500. La autorización al padre, o en su caso a la madre, para transigir, sin necesidad de aprobación judicial, cuando el valor del objeto sobre que recaiga la transacción no exceda de $500, constituye una excepción a la regla general basada en la corta importancia de la cantidad.

Ahora bien, esta facultad que se concede al padre para transigir, sin aprobación judicial cuando el valor del objeto no exceda de $500, ¿le autoriza para fijar la cuantía y prescindir de la autorización judicial cuando surge un derecho de acción en virtud de daños ocasionados al hijo? El Código Civil Español, en su artículo 274, autoriza al consejo de familia para oír el dictamen de uno o más letrados cuando se trata de transacciones solicitadas por el tutor. La legislación española, penetrada de la transcendencia de una transacción, reconoce la conveniencia de la intervención de letrados cuando la importancia del asunto lo aconseja. En el presente caso se trata de una reclamación de daños y perjuicios por lesiones que recibiera el menor, y sabido es que las mismas cortes de justicia en casos de esta naturaleza necesitan de un estudio laborioso para fallar a conciencia al fijar la cuantía de los daños y perjuicios ocasionados. Es verdad que el derecho

de acción que surge por daños inferidos a la persona es generalmente de carácter dudoso e incierto y que el valor del objeto puede ser afectado por la incertidumbre y las dudas que se abriguen con respecto al resultado definitivo en una acción judicial; pero siendo varios los elementos a considerar para juzgar la importancia del caso, como por ejemplo las lesiones inferidas, los daños ocasionados, la negligencia, etc., hay que examinarlos todos en conjunto para apreciar, siquiera sea aproximadamente, el valor del objeto que es el derecho de acción. La duda y otras circunstancias pueden influir en la cantidad que se fije para la transacción, ya que este contrato supone mutuas concesiones, el valor del objeto puede exceder de $500, y la transacción llevarse a cabo por una suma menor; pero la ley no faculta al padre para prescindir de la autorización judicial tomando como base la cantidad que juiciosa o caprichosamente fije para la transacción, sino el valor del objeto sobre que recaiga dicha transacción.

Una corte de distrito puede, por ejemplo, autorizar una transacción por una cantidad menor de $500, aunque el valor del objeto exceda de esa suma, teniendo en cuenta lo dudoso del derecho, las inconveniencias de un litigio, las concesiones mutuas inherentes a toda transacción, y otras circunstancias dignas de consideración; pero esto no quiere decir que el padre hubiese estado autorizado para transigir y prescindir de la autorización judicial en este caso por el hecho de que se fijara para la transacción una suma menor de $500. Nosotros entendemos que en un caso como éste, en que el valor del objeto depende de la naturaleza del caso, y en que no es empresa fácil determinar ese valor, la corte de distrito competente y no el padre, es la autoridad llamada a intervenir en última instancia para aprobar o desaprobar la transacción iniciada por el padre, según lo aconsejen los intereses del menor. Natural es que en una acción de daños y perjuicios, surjan dudas acerca del valor del objeto o derecho de acción, y cuando existan estas dudas, por el interés

del menor, en bien de la justicia, y de acuerdo con el espíritu de la ley, en vez de aplicarse la excepción, debemos regirnos por la regla general que requiere la aprobación judicial para que surta efecto la transacción.

En el presente caso, la demandada entregó $450 a Raimundo Cruz, haciendo constar las partes que esta suma se entenderá como una justa compensación por todos los daños y perjuicios que pudieran reclamarse contra la referida corporación con motivo del accidente, obligándose Raimundo Cruz, en representación de su hijo, a no iniciar ninguna acción contra la corporación demandada, por entender que la cantidad recibida cubre cualquier perjuicio que pudiera reclamar en representación de su menor hijo con motivo del referido accidente.

Y a renglón seguido la corporación demandada dice que en adición a la cuantía aquí pagada por vía de indemnización, se obliga asimismo a pagar todos los gastos que se originen por la asistencia médica, medicinas y gastos de estadía en el Hospital Presbiteriano de Humacao, durante todo el tiempo que el menor Francisco Cruz tenga necesidad de estar recluído en el mencionado hospital.

El documento ofrecido como prueba demuestra con claridad que el convenio no se llevó a efecto exclusivamente por la cantidad de $450, sino que se tuvieron también en cuenta los gastos de hospital, médico y medicinas que se obligaba a pagar la demandada. El accidente ocurrió en 4 de mayo de 1928, y en 2 de junio del mismo año, cuando se autorizó el convenio, el menor llevaba veintinueve días de reclusión en el hospital, según se desprende del mismo convenio. De modo que si nos atenemos exclusivamente al convenio celebrado por las partes, de la faz del mismo resulta que, amén de los $450 entregados a Francisco Cruz, la demandada se obligó a pagar una cantidad indefinida por los gastos ocasionados y que pudieran ocasionarse durante todo el tiempo que el menor tuviese necesidad de permanecer recluído en el hospital. Añádase a esto que el contrato de transacción im-

plica mutuas concesiones, y que siendo razonable suponer de parte de Francisco Cruz alguna concesión con respecto a la cuantía, surge lógicamente del mismo convenio la deducción de que las partes tuvieron *in mente,* al apreciar el valor del objeto, una cantidad mayor de $500.

Si nos atenemos a la prueba, veremos que la demandada, en la alegación que establece como materia nueva, fija en $40 la cantidad pagada por los gastos, pero no ofrece evidencia alguna para sostener esta alegación que, de acuerdo con el Código de Enjuiciamiento Civil, debe considerarse como negada.  El único testigo que declara sobre los gastos, Agustín Martínez de Andino, administrador de la demandada, dice que se pagó la cuenta del hospital donde estaban incluídas todas las radiografías que se tomaron al niño y los gastos de medicina en la farmacia, pero no fija la suma que se pagó ni a cuanto ascendieron esos gastos.  Las partes contratantes en el momento en que se llevó a cabo el convenio, ignoraban a cuánto podrían ascender estos gastos, puesto que el menor continuaba en el hospital y la demandada se obligó a cubrir dichos gastos durante todo el tiempo que dicho menor tuviese necesidad de permanecer allí, y el Dr. Segarra, médico de la demandada, cuando ocurrió el accidente, y quien asistió al niño después de practicada la primera cura por la Dra. Skent, dice que Francisco Cruz estuvo en el hospital como dos o tres meses.  Así lo dice también la corte inferior en sus conclusiones de hecho.

Resulta claro, a nuestro juicio, de la faz del propio convenio, que el contrato de transacción no adquirió vida legal, toda vez que no se cumplió con el requisito de someterlo a la aprobación judicial.

Los ilustrados abogados de la parte demandada citan en su abono la sentencia de 8 de junio de 1917 del Tribunal Supremo de España, en la cual este tribunal declara que el convenio de transacción queda perfeccionado por el consentimiento de los padres, aunque para su consumación, esto es, para que surta efecto, necesita de la aprobación judicial.  En

este caso se celebró un contrato de transacción con la madre de unos menores en representación de éstos. Pasado algún tiempo se solicitó por la otra parte la rescisión del contrato y el Tribunal Supremo de España dice que habiéndose opuesto la madre en el pleito a la demanda de nulidad de la transacción, en vez de someterla a la sanción judicial en el plazo que medió hasta la interposición de la demanda, es evidente que por su parte dejó incumplida una obligación recíproca y condicionada que da lugar a la rescisión del contrato, según el artículo 1124 del Código Civil Español (1077 de nuestro Código Civil, edición 1930). Conviene tener en cuenta que, según el artículo 1290 del Código Civil Español, equivalente al 1242 de nuestro Código Civil, edición de 1930, los contratos válidamente celebrados pueden rescindirse en los casos establecidos por la ley.

En esta sentencia el tribunal español dice que el contrato de enajenación otorgado sin autorización judicial es nulo por falta de capacidad de los padres, pero no así el contrato de transacción que se perfecciona por el consentimiento de éstos.

No podemos estar conformes con la conclusión que establece el Tribunal Supremo de España, por más que sus decisiones nos merecen el más profundo respeto. La perfección se determina por la convención de las partes, completa, acabada, definitiva, en cuanto a las relaciones creadas y a las obligaciones establecidas. Una vez perfeccionado el contrato, las partes quedan obligadas a darle efectividad mediante el requisito de la consumación. Si, como dice la Corte Suprema de España, el contrato queda perfeccionado por el consentimiento de los padres, aunque para su consumación, esto es, para que surta efecto, necesita de la aprobación judicial, sería éste el único caso en que la perfección no surta efecto sin el requisito de la consumación. La consumación es una consecuencia necesaria de la perfección. A ella quedan obligadas las partes una vez perfeccionado el contrato. A ella no puede quedar obligado un tribunal de justicia por el hecho de que el padre de un menor haya con-

venido una transacción. No acertamos a comprender cómo podría una de las partes contratantes obligar a un tribunal de justicia a impartir su aprobación a un contrato con el cual no está de acuerdo, para cumplir el requisito de la consumación. Si aceptamos el criterio del Tribunal Supremo de España nos hallaríamos en presencia de un contrato perfeccionado, cuya consumación no puede exigirse, porque no depende de la voluntad de las partes, sino de la voluntad de un tribunal competente que en el ejercicio de sus facultades discrecionales puede lo mismo aprobar que desaprobar la transacción. Desaprobar equivale a no consentir, y si la transacción no se aprueba, el contrato que el Tribunal Supremo de España considera perfeccionado por el consentimiento de los padres, quedaría *ipso facto* en el aire, por falta de consentimiento y no surtiría efecto, a pesar de su supuesta perfección. La aprobación judicial no es una función mecánica a la cual viene obligado el tribunal después de convenida una transacción por el padre. Cuando el legislador dispuso que la transacción convenida por el padre no surtiría efecto sin la aprobación judicial, quiso significar algo y no realizar un acto inútil e innecesario, carente de fuerza legal. Estas palabras resultan claras y diáfanas, forman parte de la ley, tienen su significación en nuestro idioma, y no pueden ser ignoradas por una decisión judicial.

La diferencia entre la enajenación y la transacción, cuando es necesaria la intervención judicial, estriba en que en la primera la autorización judicial es un requisito previo y en la segunda la aprobación o desaprobación puede recaer luego de aceptadas las bases del convenio. En la transacción el padre está autorizado a prestar su consentimiento, pero sujeto a la condición de que sea aprobada por la corte. Son dos entidades las que intervienen en este consentimiento: la autoridad paternal y la autoridad judicial. Sin la aprobación de la última falta el complemento necesario para que el consentimiento se manifieste en toda su plenitud. Puede

decirse que ambas entidades se complementan pero no se substituyen. El vínculo jurídico que crea las obligaciones y determina su exigibilidad no queda establecido por el mero consentimiento del padre mientras no se haya obtenido la aprobación judicial.

Veamos lo que nos dice Scaevola, comentando el artículo 1258 del Código Civil Español:

" 'Perfección del contrato' equivale a terminación, a acabamiento en su formación, a contrato perfecto, terminado o concluído de generar, dando a entender tal concepto que desde entonces produce todos sus efectos, o sea el cumplimiento de lo expresamente pactado. Por el mero concurso de la oferta y de la aceptación sobre la cosa y la causa constitutivas del contrato, éste queda perfeccionado y las partes obligadas a su cumplimiento.

"Atañe esto a lo sustancial, a lo intrínseco del contrato, con independencia de aquellos casos en que extrínseca o formalmente son necesarios determinados requisitos para su validez (arts. 1280, 1628, 1661, 1667, 1668, 1812, 1857, 1863 y 1665), ritualismo no afectante a la entraña de la norma imperante en el artículo comentado, la cual ha de regir siempre bien sola, bien en combinación con la expresada, según la explícita declaración de la *base 20* de la *ley de 11 de mayo de 1888*, de que 'los contratos . . . continuarán sometidos al principio de que la simple coincidencia de voluntades entre los contratantes establece el vínculo, aun en aquellos casos en que se exigen solemnidades determinadas para la transmisión de las cosas, o el otorgamiento de escritura . . .'

"Hablamos de terminación o acabamiento, como sinónimo de perfección, en el sentido de que desde tal instante quedan definitivamente creadas y establecidas las relaciones jurídicas constitutivas del contrato. Éste adquiere vida; en una palabra: Nace, cerrándose allí el período de gestación o de elaboración de los derechos y obligaciones en la mente de los otorgantes. El ayuntamiento de las voluntades genera las obligaciones, correlativas a su vez de otros tantos derechos, cuyo conjunto forma el cuerpo jurídico del contrato.

"Por el consentimiento se perfecciona el contrato, y la perfección indica la terminación de un período de su vida y el punto de partida de otro, el de consumación, realización o efectividad." (Tomo 20, Comentarios al Código Civil, págs. 558 y 559.)

Y Manresa, comentando el mismo artículo, se expresa así:

"I. *La perfección y la consumación del contrato.*—Períodos o fases sucesivas en el desenvolvimiento, en la vida del contrato, son la generación, la perfección y la consumación del mismo, por el orden en que acabamos de enumerarlos. Acomodándonos nosotros al que no sin motivo sigue el Código, dejamos para el comentario del artículo 1362 lo relativo a ese proceso preparatorio, que lleva desde la proposición, por todo el camino, a veces intrincado, de las negociaciones, hasta la conformidad exacta de las partes, que origina la perfección del contrato, de que ahora nos toca hablar.

"La perfección viene a significar el nacimiento, la aparición del contrato como tal vínculo obligatorio, resultado de la conformidad a que se llega. La perfección de un acto jurídico supone la concurrencia de aquellos requisitos que su esencia exige, y que determinan la producción de las consecuencias obligatorias que le son propias. Ese instante se produce en los contratos por el mero consentimiento: poco importa que se exija por la ley el otorgamiento de escritura u otra forma especial, porque, aparte de ser válido el cumplimiento de las demás obligaciones aun sin ese requisito, su exigencia sólo supone que es una obligación más; pero obligación que, por serlo y hacerse exigible, patentiza que se verificó la perfección del contrato por el consentimiento en el que tiene origen." (Tomo 8, Comentarios al Código Civil, págs. 584, 585.)

El artículo 1210 de nuestro Código Civil, equivalente al 1258 del Código Civil Español, no deja lugar a dudas. Los contratos se perfeccionan por el mero consentimiento y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Perfeccionado el contrato, surte inmediatamente sus efectos, porque adquiere vida jurídica y obliga a su cumplimiento, sin necesidad de la consumación. Es claro que el padre puede convenir la transacción y que sus actos son válidos mientras actúe de acuerdo con las facultades que le concede el inciso segundo del artículo 1710 del Código Civil; pero si las partes contratantes, en vez de someter lo pactado al tribunal competente, prescindiendo de su intervención, dan por finalizado el contrato y actúan con carácter definitivo,

entonces ese contrato, falto de vida jurídica, no surte efecto alguno, porque carece del requisito de la aprobación judicial. Las partes deben ser diligentes y procurar asegurar cuanto antes la sanción judicial para que se cumplan los propósitos de la ley. Sostener lo contrario equivaldría a dejar al transcurso del tiempo el cumplimiento de un requisito que halló cabida en el Código Civil para beneficio del menor y cuya prolongación por tiempo indefinido daría al traste con el espíritu y propósito de la misma ley.

El Tribunal Supremo de España atribuye a las partes en la transacción obligaciones recíprocas, y dice que el contrato es rescindible cuando se dejan incumplidas estas obligaciones. La obligación recíproca en este caso consiste, según dicho tribunal, en someter la transacción a la aprobación judicial. Nosotros no nos explicamos cómo puede una parte solicitar la rescisión, cuando no ha cumplido con su propia obligación. Las obligaciones recíprocas a que se refiere la ley son aquellas que surgen del mismo contrato una vez perfeccionado, y no las que se relacionan con los requisitos esenciales para que la transacción adquiera vida jurídica y surta sus efectos como tal. No se puede pedir la rescisión de un convenio que no ha llegado a ser, que no se ha convertido en contrato, y que no puede surtir efecto legal. Los actos realizados por el padre en el uso de sus facultades para transigir son válidos; pero el contrato no lo es mientras no reciba la sanción judicial.

El alto tribunal español ha declarado, en su sentencia de 4 de enero de 1866, que "el que no cumple la obligación que se impuso en su compromiso, no tiene derecho a exigir, siendo mutuos y correlativos los deberes, que la otra parte haga lo que se comprometió a hacer"; y en la de 11 de julio de 1871, que "cumplido un contrato por una de las partes contratantes, debe obligarse a la otra a que cumpla a su vez aquello a que se convino."

Los abogados de la corporación demandada sostienen que el convenio de transacción alegado en la materia nueva

de su contestación no puede ser atacado colateralmente, y citan decisiones de los tribunales supremos de España y Lóuisiana, y una decisión de esta Corte Suprema (*Matienzo* v. *González*, 26 D.P.R. 474), en la cual se advierte la tendencia a aceptar la doctrina de que un convenio de transacción no está sujeto a impugnación colateral, sostenida por la Corte Suprema de Louisiana. Esta doctrina se basa en preceptos sustantivos de la ley que tanto en España como en Louisiana y Puerto Rico equiparan la transacción, que tiene el carácter de cosa juzgada, a la decisión de una controversia por un tribunal de justicia.

Nosotros creemos que cuando de la faz de la misma transacción surge un defecto sustancial, como cuando falta la aprobación judicial en los casos en que se exige por la ley, el contrato carece de validez y puede ser atacado colateralmente sin necesidad de solicitarse previa y directamente su nulidad.

La doctrina aplicable a las sentencias en general, haciéndolas inmunes a impugnaciones colaterales, no es aplicable a las transacciones que no hayan sido objeto de confirmación judicial. 12 C. J. 341.

El procedimiento generalmente adoptado por las cortes americanas exige confirmación judicial para que la transacción resulte inmune a un ataque colateral; nuestro Código Civil exige la aprobación judicial para que la transacción surta efecto, cuando es el padre o la madre quien transige sobre los bienes o derechos de un hijo y el valor del objeto excede de $500. Nosotros creemos que debe adoptarse la doctrina que permite el ataque colateral, cuando la transacción requiere autorización o aprobación judicial y no se ha cumplido con ninguno de estos requisitos.

Copiamos de la opinión emitida por el Juez Brown en el caso de *Gibson* v. *Nelson*, 111 Minn. 183, 126 N. W. 731:

"Llegamos entonces a la cuestión relativa a si la estipulación sobre transacción y desistimiento puede ser anulada en este pleito, o si los procedimientos en el litigio anterior debieron ser tomados para dicho

fin. Los letrados de la parte demandada presentaron este aspecto del caso con mucho entusiasmo, y nosotros hemos dado al asunto seria y cuidadosa consideración, con el resultado de que no nos es posible concurrir con su criterio relativo a las reglas de derecho pertinentes a la materia. La doctrina contraria a ataques colaterales es aplicable casi exclusivamente a sentencias de cortes debidamente constituídas, o a los procedimientos y decisiones de funcionarios judiciales o cuasi judiciales en asuntos que caen dentro de su jurisdicción. No tiene aplicación a contratos, a estipulaciones o convenios en pleitos o procedimientos que no son seguidos por confirmación judicial. Todos los documentos privados, contratos y convenios, están sujetos a ser atacados por fraude o por falta de autoridad de parte del agente para celebrar el mismo, cuandoquiera o doquiera que se aleguen derechos bajo los mismos. Es innecesario atacarles mediante un procedimiento directo.

"La estipulación en cuestión se refería a una transacción del litigio, o sea a un contrato que no fué seguido por una sentencia, y cae dentro de la regla sentada. No puede ser diferenciada de una transacción y exoneración corrientes, anteriores a la institución de un pleito. En casos de esa naturaleza, de conformidad con las autoridades generales, hemos resuelto uniformemente que la parte perjudicada puede pasar por alto la exoneración, instituir un litigio fundándose en la causa de que ha exonerado, y al radicarse una contestación alegando la transacción y exoneración, contestar que éstas fueron obtenidas mediante fraude, que no eran válidas por algún otro motivo y que carecían de fuerza obligatoria: Christianson v. Chicago etc. Ry. Co., 61 Minn. 249, 63 N. W. 639, 67 Minn. 94, 69 N.W. 640; Peterson v. Chicago etc. Ry. Co., 36 Minn. 399, 31 N.W. 515.

"Fundándose la estipulación en una transacción del litigio y en un contrato de exoneración de responsabilidad al demandado, ésta cae dentro de la regla y está sujeta a ser atacada en este procedimiento precisamente tal cual si no se hubiese incluído en el mismo disposición alguna sobre el desistimiento del litigio. Si se hubiese dictado una sentencia formal, es probable que hubiera sido necesario un procedimiento directo para anularla; más no se dictó tal sentencia hasta que el litigio estaba fuera de la jurisdicción de la corte a virtud del desistimiento personal del demandado. Por tanto resolvemos que era innecesario atacar la estipulación mediante moción o en alguna otra forma en el litigio anterior.

"Las autoridades citadas por la parte demandada en apoyo de la contención de que la estipulación tiene el mismo peso y efecto que una sentencia, no sostienen la posición, y la investigación que hemos hecho

no ha traído a la luz ningún caso en que la regla aducida haya sido aplicada a una estipulación en que no se dictó sentencia.''

La Corte Suprèma de Minnesota se refiere a transacciones que no han sido objeto de confirmación judicial. En el presente caso consideramos aplicable y saludable esta doctrina, por tratarse de un contrato en que intervienen menores y que requiere aprobación judicial, y porque además el hecho de que el padre no estaba autorizado para transigir, prescindiendo de la aprobación de la corte de distrito competente, surge de la misma transacción.

El demandante, por conducto de su abogado, solicita de este tribunal el pronunciamiento de la sentencia que debió haber dictado la corte inferior, de acuerdo con el artículo 306 del Código de Enjuiciamiento Civil.

En sus conclusiones de hecho dice la corte inferior que la prueba relativa a si el menor demandante era o no un empleado de la demandada es en un todo contradictoria, pero que es un hecho cierto que el referido menor trabajaba en la central, con conocimiento y aquiescencia de la demandada, si bien se alega por ella que el trabajo lo hacía por cuenta de su padre Raimundo Cruz. Examinemos la prueba para ver si resulta probada o no la alegación de que el accidente de que fué víctima Francisco Cruz se debió a la negligencia de la corporación demandada, en momentos en que el demandante trabajaba al servicio de la referida corporación.

El testigo Flor Cruz declara que es carretero, que allá por el mes de mayo del año pasado (1928) trabajaba en la colonia Mulas de la Central Pasto Viejo, colonia que se dedica a sembrar cañas, que Francisco Cruz trabajaba con él en el carro y que su trabajo era darle cohollos a los bueyes y recoger las cañas, que este empleo que el niño desempeñaba se conoce con el nombre de rabero, que el testigo y el niño estaban empleados con don Luis Rivera, mayordomo de la central, que el niño había estado trabajando como cuatro o cinco días antes de ocurrir el accidente, que el caso pasó arriba, al subir el cerro a mediados del camino, que cuando

ocurrió el suceso el testigo estaba carreteando caña de las piezas para las grúas, que yendo para la pieza de caña, a mediados del camino, había un callejón que cruzaba el cerro, y que a mediados del cerro la rueda de un lado del carro resbaló, porque el carro estaba más alto de un lado que del otro, y que el testigo trató de picar el buey de abajo, o sea tocarlo con la vara, y el buey era un poco pesado y no obedeció y como el otro buey era más arisco siempre el carro se viró y cogió debajo al niño, y entonces el declarante lo recogió. "Yo no iba montado", dice el testigo, "iba del lado de abajo picando la yunta de bueyes y como el novillo de arriba era más arisco que el otro, yo piqué con la vara y al mismo tiempo resbaló y fué a picar al de abajo, y el de abajo *me* (sic.) obedeció y viró el carro." Continúa declarando el testigo y dice que conoce a Raimundo Cruz y que éste no estaba en el sitio del suceso, que estaba al frente de la casa en una pieza de caña con una brigada, al pie de donde se conducía la caña, que vió al padre cuando le entregó al niño en el camino y no antes, que lo vió en la casa, en una pieza de caña donde estaba trabajando y lo llamó, que el declarante y Juan Martínez llevaban al niño en los brazos y allí vino el padre y recibió al niño.

El testigo Juan Martínez declara que hace tres o cuatro años trabaja como cuartero, que conoce bastante la cuestión de carros y bueyes, que el cuarteo consiste en enyugar una yunta de bueyes, o dos o tres, y el cuartero es quien la guía y la conduce, que sabe muy bien cómo se conducen los bueyes y que ha tenido experiencia en ello; que trabajaba de cuartero en la colonia Mulas, que vió a Francisco Cruz empleado en la profesión de rabero como cuatro o cinco días y que al que da rabos se le llama rabero, que la colonia en que desempeñaba ese empleo era "Las Mulas", de la Central Pasto Viejo, que los cuarteros eran cuatro y el carretero Flor Cruz, que lo primero que hacían todos los días al empezar los trabajos era ir al chiquero a enyugar, que allí enyugaban y salían para la pieza, carretero, rabero, cuartero y capataz,

que el día del accidente de Francisco Cruz el testigo vió a éste por la mañana en el chiquero enyugando yuntas y arreando bueyes, y después lo vió detrás del carro de Flor Cruz, yendo el testigo de cuartero; que salieron del chiquero el carretero, el cuartero, el rabero y el capataz, que iban a pie Flor Cruz y el niño, y al llegar a un sitio que era un callejón, que al lado le quedaba un callejón, un risco, iba un buey arisco y otro más calmoso y el carretero hincó al buey arisco y entonces el carro se volcó y cogió al niño, que en el camino había una zanja grande y el carro cayó allí dentro, que el carro se viró debido a que el carretero hincó al buey que no era y que cuando lo hincó el buey brincó y el carro se viró, que el carretero se equivocó porque hincó al buey arisco que era bastante arisco y que si no lo hubiese hincado quizá no le pasa nada al niño, porque si no lo hinca no hubiera caído el carro al hoyo; que el menor iba apareado al carro y cuando éste dió la vuelta lo alcanzó, que el camino es malo, y que en los días anteriores habían pasado por ese mismo camino con el niño Francisco Cruz, que se dirigían a la pieza en que se había de llenar la caña, en el mismo trabajo que habían tenido los días anteriores, que al testigo le pagaba la Central Pasto Viejo $1.25 diarios y que sabe que al niño le pagaban porque nadie va a trabajar gratis.

Juan N. Torres declara que estaba carreteando el día que ocurrió el accidente, que conoce al niño demandante pero no recuerda su nombre, que no recuerda si el accidente ocurrió en el mes de mayo o en el mes de junio, que vivía en Las Mulas desde mucho antes de golpearse el niño, cerca de la casa de éste, que lo cierto es que el accidente ocurrió yendo el testigo en un carro para llenarlo de cañas a un cerro que había más arriba de la casa donde vivía el testigo, que iban más carros, y que no recuerda cuántos eran, que iba detrás de Flor Cruz, que el niño iba al lado de Flor Cruz y Juan Martínez delante, que el testigo trabajaba con Luis Rivera, mayordomo de la colonia Mulas, que la Central Pasto Viejo le pagaba al testigo por mediación de Luis Ri-

vera, y que sabe que al niño le pagaba la Central porque trabajaba en dicha Central, que está seguro que el niño trabajaba en la Central Pasto Viejo porque estaba allí trabajando en presencia suya porque también le pagaba la Central, porque el niño trabajaba con don Luis y don Luis trabajaba también en la Central Pasto Viejo, que iba a cobrar con el niño y vió cuando le pagaban el dinero, que pocos días antes del accidente estuvo en casa del niño, que estaban allí la madre del niño y don Luis Rivera pero no el padre, Raimundo Cruz, y que oyó cuando don Luis le dijo al niño que se fuese a dar rabos con Flor Cruz que ganaría igual; que cuando subían una *jardita* vió que Flor Cruz hincó al buey de la parte arriba y el otro buey era un poco arisco y se fué para encima del otro y al írsele encima el carro se viró; que el carretero hincó al buey de la parte arriba, al arisco, que el carro se volcó porque el carretero hincó al buey que no era, que hace mucho tiempo que el testigo es carretero y que si se hubiera hincado al buey de abajo no se habría volcado el carro, que el carretero le clavó el clavo al buey más arisco, al de la parte de arriba, y como era arisco el buey se tiró encima del otro y el carro resbaló y se viró y cogió al niñito.

Alejandrina Franco, madre del niño, declara que se mudaron de Río Blanco a la colonia Mulas a indicación del mayordomo Luis Rivera, que cuando su hijo vivía en Naguabo estaba en la escuela y que el mayordomo le dijo a su esposo que el niño no iba a encontrar escuela, que lo pusiera a trabajar, y entonces le dijo que se fuera a dar agua que le pagarían a 50 centavos, que lo mandó a dar agua a una pieza de peones, que su hijo estuvo dando agua como dos semanas y entonces vino don Luis y dispuso que al otro día se fuera con Flor Cruz a darle rabos a los bueyes, que le pagaría lo mismo, que el niño le entregaba semanalmente lo que ganaba trabajando en la Central Pasto Viejo, que no sabe con quién trabajaba, porque no conocía a los capataces, que su esposo

Raimundo Cruz trabajaba en la misma colonia, pero que el niño no iba a trabajar con su padre.

Luis Rivera declara que allá por el día 4 de mayo de 1928 trabajaba en la colonia Mulas de Pasto Viejo, que conoce a Raimundo Cruz y a un niño que se llama Francisco Cruz y conoce también a Alejandrina Franco y que estas personas vivían en la colonia Mulas, que el testigo estaba entonces empleado como mayordomo de la demandada, cargo que estuvo desempeñando durante tres años, que no es mayordomo de esa colonia desde el día 5 de abril de este año (1929), que las obligaciones del testigo eran autorizar los trabajos agrícolas de todo lo que hay que hacer en la colonia, desyerbo, arado, corte y recolección de cañas, zanjeo, todo lo que hubiera que hacer, que el testigo era quien nombraba el personal de la colonia Mulas para la distribución del trabajo, que en la semana del 26 de abril al 3 de mayo de 1928 trabajaron muchas personas en la colonia, que entre ellas trabajaba Raimundo Cruz y estaba también Francisco Cruz trabajando con su padre, que Raimundo Cruz estaba desyerbando por ajuste y que éste utilizaba a Francisco Cruz en su ajuste como aguador, que era el padre quien le pagaba el jornal a Francisco Cruz, que el testigo no podía figurar el jornal del personal que trabajaba por ajuste, que lo figuraba el que hacía el ajuste con el mayordomo, y que el testigo aunque no anotase el personal lo que hacía era contarlo y saber el número de personas que tenía trabajando, y le hacía un *ticket* del total del trabajo, que el ajustador coge un *ticket* y se lo da al ajustado, que entonces éste tiene su gente y le da la nota al ajustador y éste le paga el importe que cobra del total de ese *ticket,* que el menor Francisco Cruz era el que estaba en el trabajo y Raimundo Cruz, el padre, era el que trabajaba por ajuste, porque el testigo no podía hacer un contrato de ajuste con un niño como Francisco Cruz, que el niño iba a la escuela unas veces y otras no, y andaba con el padre por allí, que veía al niño jugando por allí y andando, que lo veía en el trabajo con el padre como aguador, traba-

jando para los peones que tenía el padre y por eso dice que estaría trabajando, que Raimundo Cruz se dedicaba a hacer ajuste de desyerbo, a hacer cunetas, zanjeo, y si no había trabajo por ajuste, a bombear cañas, a cortarlas y a llenar carros de caña, que cuando Raimundo Cruz terminó el trabajo de desyerbo como a mitad de la semana en que ocurrió el accidente, lo mandó a bombear cañas, que el día del accidente lo mandó a bombear cañas a la pieza donde estaban los carros cargando cañas, que la pieza estaba cerca de la colonia, en la parte arriba, que trabajaban allí ocho o diez personas, un carretero y más nadie, que la caña se recogía y se hacía el primer bombeo estando en un alto y se hacía otro bombeo si era necesario hasta que se bombeaba en una joya y allí la recogía el carretero, que la caña se bombeaba hasta sacarla a un sitio en que pudiera el carro llenar, porque primero se hace el bombeo y después del bombeo se hacen otras cosas, y un carro viene y coge las cañas, que el carretero manda un hombre o dos o tres a recoger la caña que queda en un montón para que cuando venga el carro encuentre la caña recogida y pueda dar más viajes, que eso era lo que hacía Raimundo Cruz el día 4 de mayo de 1928, en que ocurrió el accidente, del cual se enteró después de ocurrido. A preguntas del abogado Sr. Gallardo contestó este testigo que había estado en la oficina del Lcdo. Aponte para hablar del caso, que el abogado Sr. Gallardo le dijo que necesitaba que fuera su testigo y que él contestó que vivía en la colonia Mulas y no podía hacer ninguna acción hasta que se saliera de ella, que después tendría en su pensamiento qué debería hacer. Luego, contestando al Sr. Aponte, dice que recibió una carta del Sr. Gallardo donde le decía que el caso estaba señalado para el día 1º. de agosto y debía venir, que no está declarando a petición del Sr. Gallardo, que si su declaración está en favor de la compañía, pues está con la compañía, que es la compañía que representa el Sr. Vendrell. Preguntado si Gallardo sabía lo que venía a declarar, contestó:

"Como usted comprenderá a un enemigo no se le va·a decir que venga a declarar. Me parece que no sabía lo que venía a declarar, porque no estuve hablando de declaración con él."

Se presentaron por la demandada varias listas de pago (*pay-rolls*) para demostrar que en la fábrica trabajaba un individuo llamado Francisco Cruz, que no es el demandante, y que Raimundo Cruz hacía trabajos de ajuste. En la lista que corresponde a la semana del 26 de abril al 3 de mayo de 1928, Raimundo Cruz aparece trabajando por día a $1.25 el día, y el 4 de mayo, fecha del accidente, no aparece su nombre en la lista.

La demandada alega en su contestación, bajo juramento, que no ha tenido intervención directa ni indirecta en el accidente del menor demandante, siendo la causa inmediata del mismo la negligencia del padre del demandante, Sr. Raimundo Cruz, quien ordenó a su hijo que se montara en uno de los carros que se dirigían hacia una de las colonias propiedad de la corporación demandada. En el contrato que se trató de celebrar entre la demandada y Raimundo Cruz, en representación de su hijo, dice el padre que con el fin de utilizar a su hijo menor Francisco Cruz le ordenó que se dedicara a darle rabos de cañas a los bueyes. El mayordomo Luis Rivera declara que Raimundo Cruz trabajaba por ajuste y que si no había trabajo de ajuste se dedicaba a bombear, cortar o llenar carros de caña. Añade dicho mayordomo que la semana del accidente, cuando Raimundo terminó el ajuste de desyerbo, lo mandó a bombear cañas, precisamente el mismo día del accidente. La declaración del mayordomo concuerda con la lista de pagos presentada por la demandada. Raimundo Cruz, lejos de aparecer trabajando por ajuste, figura trabajando por día en la lista que corresponde a la semana del 26 de abril al 3 de mayo de 1928, y el 4 de dicho mes, o sea el día del accidente, su nombre no aparece en ninguna parte. Don Luis Rivera mandó ese día a Raimundo Cruz a bombear cañas, que era uno de los trabajos a que se dedicaba cuando no había trabajos de ajuste. Cuando don

Luis dió esta orden ya Raimundo había terminado el desyerbo del ajuste. Es evidente que el padre del niño en la fecha del accidente no trabajaba por ajuste y sí por día. Su ocupación en ese día fué bombear cañas. Raimundo Cruz no derivaba ventaja alguna de utilizar los servicios de su hijo. El trabajo que el menor realizaba en la Central cuando ocurrió el accidente beneficiaba exclusivamente a la corporación demandada. Queda demostrado que el menor trabajaba con el consentimiento y aquiescencia de la demandada, como dice la corte inferior, y que prestaba sus servicios a dicha demandada en los momentos en que ocurrió el accidente. Es de notarse que Raimundo Cruz no aparece en el sitio donde ocurrió el accidente. Sobre este extremo no hay contradición en la prueba. El carretero Flor Cruz declara que cuando llevaba el niño en los brazos en unión de Juan Martínez encontró a Raimundo trabajando con una brigada frente a su casa, en una pieza de caña. Toda la prueba demuestra, sin dejar lugar a dudas, que el niño no trabajaba ese día al lado de su padre. La misma prueba de la corporación demandada demuestra que el niño había sido enviado a darle rabos a los bueyes, aunque se hace constar que por órdenes del padre.

El artículo 7 de la Ley No. 73 de 1919, regulando el trabajo de mujeres y niños y protegiéndolos contra ocupaciones peligrosas, dice que ningún niño menor de doce años será empleado o se le permitirá que trabaje en alguna ocupación lucrativa. El artículo 5 de la misma ley, copiado textualmente de nuestra Carta Orgánica, dice que queda prohibido el empleo de niños menores de catorce años en cualquier ocupación perjudicial a la salud o a la moral que ponga en riesgo su vida o parte de su cuerpo. Por el artículo 14 de esta ley se fija una penalidad a todo patrono que infrinja cualquiera de sus disposiciones. El artículo 3 de la Ley No. 75 de 1921, para reglamentar el empleo de menores, disponiendo la asistencia obligatoria de los niños de Puerto Rico a las escuelas y para otros fines, dispone, según fué

enmendado en 1925, que ningún niño. será empleado ni se le permitirá ni tolerará que trabaje en ninguna ocupación lucrativa ni en relación con ella, excepción hecha del trabajo doméstico y en granjas y jardines, según lo dispuesto en el artículo 21 de esta ley, por más de seis días consecutivos en una sola semana, ni más de cuarenta y ocho horas en una semana, ni más de ocho horas en un solo día, ni antes de las ocho de la mañana ni después de las seis de la tarde. De acuerdo con el artículo primero de esta ley, enmendado en 1925, la palabra niño significará cualquier persona menor de diez y seis años. El artículo 8 de la ley mencionada de 1921 dice así:

"Ningún niño de catorce y menor de diez y seis años será empleado, ni se le permitirá ni tolerará que trabaje en ninguna ocupación lucrativa ni en relación con ella, excepción hecha del trabajo doméstico y en granjas y jardines a menos que su patrono procure y conserve en sus archivos, y accesible para cualquier funcionario, inspector u otra persona autorizada para obligar o ayudar al cumplimiento de esta Ley, un permiso para trabajar durante el curso escolar expedido de acuerdo con lo que más adelante se dispone en esta Ley, y que fije una lista completa de todos estos niños empleados en tal ocupación en un sitio visible del local donde tales niños están empleados."

El artículo 19 de esta ley impone una penalidad a cualquier persona que emplee, procure emplear o permita que se emplee a un menor con infracción de cualquiera de las disposiciones de esta ley de 1921.

Puede que esta ley de 1921 y otras análogas a ella hayan sido aprobadas principalmente con el propósito de garantizar la educación del niño, pero no así la Ley de 1919, que contiene disposiciones contra ocupaciones peligrosas y que tiene por objeto principal proteger a las mujeres y a los niños contra determinadas ocupaciones. Todas estas leyes prohiben el empleo de niños menores de diez y seis años en ocupaciones lucrativas. La prohibición contenida en la ley de 1919 se refiere a menores de doce años, y la de 1921, enmendada en 1925, contiene la misma prohibición con res-

pecto a niños menores de diez y seis años, pero autoriza la ocupación de un niño en trabajos domésticos y en granjas y jardines.

Ocupación lucrativa, según la sección 15 de la ley de 1919, incluye toda obra o trabajo en factorías, molinos, centrales, talleres de maquinarias o establecimientos o sitios de cualquier clase donde haya una fábrica o empresa mecánica; en almacenes, tiendas, establecimientos o sitios de cualquier clase donde se realicen operaciones mercantiles; en fincas, haciendas, estancias o sitios de cualquier clase en los cuales se dirijan empresas agrícolas, de horticultura o pastoreo, y en toda empresa de minería o pesquería.

"Plantación" incluye toda hacienda, estancia u otro lote de tierra en que se ejerza alguna ocupación lucrativa.

El texto inglés del párrafo que acabamos de copiar, al definir las palabras ocupación lucrativa, incluye trabajos en *"farms"* y *"plantations"*, como significando cosas distintas. La enmienda aprobada en 1925 excluye de la prohibición los trabajos domésticos y los que se realicen en granjas y jardines (el texto inglés usa las palabras *farms and gardens*), pero no excluye trabajos en plantaciones y como esta palabra incluye toda hacienda, estancia u otro lote de tierra en que se ejerza alguna ocupación lucrativa, resulta claro que la corporación demandada autorizó, permitió y toleró que Francisco Cruz trabajara en una ocupación prohibida por la ley. El texto castellano resulta más claro que el texto inglés, porque este último, al establecer la excepción aprobada en 1925, usa las palabras *"farms and gardens"* y el texto castellano habla de granjas y jardines. Es claro y evidente que Francisco Cruz no trabajaba ni en una granja ni en un jardín.

El apelante invoca la doctrina sentada en *Rivera* v. *Ribas*, 31 D.P.R. 361. En este caso la corte resolvió por mayoría que el empleo de niños en contravención de la ley constituye negligencia *per se*. La corte además declaró que la ocupa-

ción de dar rabos de caña a los bueyes y recoger las cañas que se caen mientras los carros cáminan es esencialmente peligrosa. La minoría de la corte sostuvo que la ocupación de dar rabos de caña a los bueyes no es una ocupación peligrosa que constituya negligencia *per se*. Irrespectivamente de la interpretación que pueda darse a esta ocupación desde el punto de vista del peligro que envuelva, la verdad es que la corporación demandada autorizó, toleró y permitió que Francisco Cruz, niño que aun no había cumplido diez años de edad, se ocupara el día del accidente en un trabajo prohibido por la ley. Cualquiera que sea el alcance probatorio de la violación del estatuto, ya se considere como negligencia *per se* o como prueba prima facie de negligencia, entendemos que la prueba aportada demuestra que la demandada es responsable del accidente.

La corte inferior nos dice en sus conclusiones de hecho que no hay contención alguna en cuanto a la forma en que ocurrió el accidente, así como con respecto al punto de que el niño fué lesionado al caerle el carro encima. Los testigos Juan Martínez y Juan N. Torres declaran que había un buey arisco y que el carretero que guiaba el carro hincó a este buey. Juan N. Torres dice que el buey, como era arisco, se tiró encima del otro y el carro se viró; Juan Martínez declara que el buey brincó y el carro se viró y cayó en una zanja grande que allí había. Ambos testigos afirman que si no se hubiera hincado al buey arisco el carro no se habría virado. Flor Cruz, quien guiaba el carro que ocasionó el accidente, declara que hincó al buey de abajo, el cual era un poco pesado y no obedeció y como el otro buey era más arisco, siempre el carro se viró. Luego dice: "Como el novillo de arriba era más arisco que el otro, piqué con la vara y al mismo tiempo resbaló y fué a picar al de abajo, y el de abajo *me* (sic.) obedeció y viró el carro." La declaración de este testigo es algo confusa. Dice que como el novillo de arriba era más arisco picó con la vara que al

mismo tiempo resbaló y fué a picar al de abajo. Tal parece que al picar el carretero a uno de los bueyes con la vara, ésta resbaló y fué a picar al otro, al de abajo, que era el manso, y si esto es así, y picó primero al buey de arriba, o sea al arisco, y luego al manso, su declaración no está en conflicto en este extremo con el testimonio de Juan Martínez y Juan N. Torres que declaran que dicho carretero hincó al buey arisco.

En cuanto a la descripción del sitio donde ocurrió el accidente, la prueba no es tan clara como fuera de desear pero arroja bastante luz para que podamos darnos cuenta de las circunstancias que concurrieron al ocurrir el accidente. Flor Cruz declara que el accidente ocurrió al subir el cerro, que había un callejón que cruzaba el cerro y que a mediados del cerro la rueda de un lado del carro resbaló, porque el carro estaba más alto de un lado que del otro; que trató de picar al buey de abajo que no obedeció y como el otro buey era más arisco siempre el carro se viró. El testigo Juan Martínez dice que al llegar a un sitio que era un callejón, que al lado le quedaba un callejón, un risco, fué que ocurrió el accidente; que en el camino había una zanja grande y el carro cayó allí dentro, que el camino es malo y que en los días anteriores habían pasado por el mismo con el niño Francisco Cruz. Juan N. Torres dice que lo cierto es que el accidente ocurrió yendo en un carro a llenarlo de cañas a un cerro que había más arriba de la casa del testigo y que cuando subían una *jardita* fué que Flor Cruz hincó al buey arisco y se viró el carro.

La prueba demuestra que el carretero iba a pie y que cuando hincó al buey arisco el carro subía una pendiente y estaba más alto de un lado que del otro y el niño se encontraba a una distancia donde podía ser alcanzado, como efectivamente lo fué, por el carro que se viró y cayó en una zanja que allí había. Queda demostrado que la demandada utilizaba un buey arisco, que permitió al niño trabajar de rabero

con este buey y pasar con el carro por un camino malo donde había una zanja y mientras el carro subía una pendiente, que el accidente ocurrió cuando fué hincado el buey arisco, que se estaban violando por dicha demandada las disposiciones de la ley y que todo esto se hacía con un menor de nueve años y meses, de cuyos servicios se beneficiaba. A nuestro juicio todos estos actos ponen de relieve la negligencia de la parte demandada.

█ Réstanos ahora determinar la cuantía de la indemnización. La corte inferior, en sus conclusiones de hecho, dice que el niño fué lesionado al caerle el carro encima, habiendo sufrido como consecuencia de las lesiones recibidas una fractura en la base del cráneo, lesión de carácter grave que lo tuvo recluído en el Hospital Presbiteriano por espacio de dos o tres meses, así como privado del conocimiento por espacio de ocho o diez días, presentando una parálisis del lado izquierdo de la cara y habiendo sufrido desperfectos en los órganos visuales que le producen la doble vista, o sea el ver los objetos repetidos, sufriendo además fuertes dolores físicos. Refiriéndose a la parálisis de que habla la corte inferior, el Dr. Segarra, único perito que declaró en este caso, dice que el niño no puede pestañear normalmente porque hay una parálisis del lado izquierdo total, absoluta, y que esta parálisis es de carácter permanente. Añade el perito que el niño está igual a como lo vió cuando se levantó del hospital. El pronóstico de este niño es sombrío, "porque tenemos dos clases de parálisis, en la cara y en la frente." El niño tenía nueve años y gozaba de buena salud, y ganaba cincuenta centavos diarios, según declara la madre. Entendemos que debe concedérsele una indemnización de $5,001.00.

*Debe revocarse la sentencia apelada, sin especial condenación de costas.*

Los Jueces Asociados Señores Wolf y Aldrey disintieron.*

---

* Nota: Véase el prefacio.