*In re* Luis A. López Olmedo.

*Número:* MC-87-29     *Resuelto:* 23 de enero de 1990

*Norma Cotti Cruz, Subprocuradora General,* e *Iván F. Fuster,*
*Procurador General Auxiliar,* abogados de El Pueblo; *Juan S.*
*Pagán Rodríguez,* abogado del querellado.

## SENTENCIA

En el caso de epígrafe, vistas las conclusiones de hecho
expuestas por el Procurador General en su informe sobre
conducta profesional, las cuales no fueron controvertidas por
el abogado-notario Luis A. López Olmedo, y analizados los
planteamientos de derecho aplicables, el Tribunal resuelve lo
siguiente: (1) decretar la nulidad del pagaré hipotecario al
portador y de la Escritura Núm. 20 sobre constitución de
hipoteca, y (2) limitar su sanción disciplinaria a una amones-
tación al notario López Olmedo, además de apercibirle que
en el futuro deberá observar con mayor rigor los preceptos
notariales en el descargo de sus funciones.

Así lo pronunció y manda el Tribunal y certifica el señor
Secretario General. El Juez Asociado Señor Hernández
Denton emitió opinión concurrente. El Juez Asociado Señor
Negrón García emitió opinión concurrente y disidente, a la
cual se unen los Jueces Asociados Señores Rebollo López y
Ortiz: concurre con el decreto del pagaré hipotecario al por-
tador y la nulidad de la escritura de constitución de hipoteca,
y disiente de la sanción disciplinaria. La Juez Asociada Se-
ñora Naveira de Rodón emitió opinión concurrente y disi-
dente, a la cual se unen el Juez Presidente Señor Pons Núñez
y el Juez Asociado Señor Alonso Alonso: concurre con la san-

ción disciplinaria y el decreto de la nulidad de la escritura de constitución de hipoteca, y disiente con el decreto de nulidad del pagaré hipotecario al portador.

(*Fdo.*) Francisco R. Agrait Lladó

*Secretario General*

—O—

Opinión concurrente y disidente del Juez Asociado Señor Negrón García, a la cual se unen los Jueces Asociados Señores Rebollo López y Ortiz.

I

En las circunstancias del caso de autos, el contrato de préstamo (evidenciado en un pagaré hipotecario al portador) otorgado por el menor Pablo R. Meléndez Gómez ante el notario López Olmedo *sin autorización judicial,* es nulo conforme todo el cuerpo legal y doctrinario prevaleciente. Así lo ha entendido la mayoría del Tribunal.

Como demostraremos, si bien la falta de capacidad plena para contratar del menor no convierte en nulo un contrato otorgado, la ausencia de autorización del órgano judicial, cuando es requerida, sí tiene ese efecto. Expliquémonos.

II

Afirma Puig Brutau que "[l]as dudas que puedan suscitar los contratos celebrados por los menores de edad han de resolverse . . . teniendo en cuenta que, como dice CASTÁN, 'siempre que se trate de menores que tengan uso de razón, el contrato es anulable y no inexistente, porque una cosa es la falta de consentimiento y otra el consentimiento viciado.'" J.M. Puig Brutau, *Fundamentos del Derecho Civil,* 2da ed. rev., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, págs. 332–333.

Aunque nuestro Código Civil nunca alude directamente a los contratos anulables, esta categoría puede deducirse del

texto del Art. 1252 (31 L.P.R.A. sec. 3511), el cual dispone que aquellos contratos en que concurran los requisitos esenciales para su validez (objeto, consentimiento, causa y forma en los casos excepcionales) pueden ser anulados aunque los contratantes no hayan sufrido lesión, si adolecen de algunos de los vicios que, conforme a la ley, los invalidan. Estos son: los vicios del consentimiento y la falta de capacidad plena para obrar, como es *el caso del menor no emancipado,* el beneficiado con la emancipación menos plena, y el caso de falta de consentimiento de uno de los cónyuges cuando se requiera el de ambos. J.R. Vélez Torres, *Los Contratos*, San Juan, 1987, Primera Parte, págs. 170-171.

Así, en *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494, 504 (1961), consignamos que "el acto nulo no produce ninguno de los efectos jurídicos que se proponía; el anulable los produce mientras no se anule. *El acto nulo es insubsanable por razones de orden público*, mientras que el anulable puede generalmente ser confirmado o subsanado por qui[e]n podría invocar el vicio o defecto del mismo. La nulidad relativa o la anulabilidad opera en favor de las personas que han cometido un error o contra las cuales se ha utilizado violencia, intimidación o dolo". (Énfasis suplido.)

### III

Esta breve exposición doctrinaria sería suficiente para solucionar la controversia en derecho civil que el ejercicio de nuestra jurisdicción disciplinaria genera. Contrario a cualquier otra conclusión, la situación de autos no versa sobre una confirmación de un acto anulable. Se trata, sin duda alguna, de un *negocio nulo* que nunca cobró validez por haberse prescindido de cumplir con una exigencia legal clara y expresa. Y como afirma Luis H. Clavería Gosálbez, la confirmación no es un acto de integración de un negocio incompleto o defectuoso ni tampoco un acto de subsanación de un

negocio irregular. El contrato es nulo porque violó una *norma imperativa.*(1) Puig Brutau, *op. cit.*, pág. 302.

El primer párrafo del Art. 4 del Código Civil, 31 L.P.R.A. sec. 4, dispone que "[s]on nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez". Y el Art. 159 del Código Civil, 31 L.P.R.A. sec. 616, exige expresamente autorización previa del Tribunal Superior, fundada en comprobada necesidad o utilidad, para la enajenación de bienes inmuebles o muebles que excedan ciertas cuantías.(2)

---

(1) "Son normas imperativas, o de *'ius cogens'*, aquellas cuyo mandato es de inexcusable cumplimiento, debiéndose ajustar la conducta de la persona, su comportamiento, a lo establecido por la norma para que sus actos tengan validez y eficacia jurídica. De esta exigencia, precisamente, surge la *penalización sancionadora máxima* que el ordenamiento público y privado deduce por la actuación en contra de lo allí preceptuado, *cual es la nulidad de pleno derecho.* Mientras que las normas facultativas o dispositivas conceden a la autonomía de la voluntad privada un màrgen de facultades distinto del preceptuado en las propias normas, *en las imperativas y prohibitivas ese margen de autonomía queda eliminado, teniéndose que acomodar la actuación de las personas a lo preceptuado concretamente en el mandato normativo.*

"El efécto de la nulidad de pleno derecho, en cuanto sanción a los actos contrarios a lo dispuesto en las normas imperativas y lòs actos realizadòs en contra de lo prohibido, se refiere a las relaciones jurídicas, actos y negocios que tienen una naturaleza sustantiva o una importancia decisiva para los intereses personales y patrimoniales de las personas, de la familia o del Estado. *De aquí la sanción de nulidad de pleno derecho a aquellos actos què implican tales intereses,* lleve aparejada su inexistencia o supresión, siendo la sanción más fuerte que se les puede imponer, al resultar sin eficacia alguna. Por eso se destina a vulneraciones muy importantes y fundamentales en la vida de relación de las personas, de modo que los contraventores no obtenga[n] algún resultado jurídico." (Énfasis suplido y citas omitidas.) J.R. Bonet Correa, *Los actos contrarios a las normas y sus sanciones,* XXIX (Núms. 1–2) Án. Der. Civ. 309, 317–318 (1976).

(2) La opinión concurrente de la Juez Asociàda Señora Naveira de Rodón parece sugerir que como de la propia faz del pagaré hipotecario no surge que la madre del menor compareciera a su otorgamiento, no es de aplicación el Art. 159 del Código Civil, 31 L.P.R.A. sec. 616. Es derivable, así, el corolario de que la autorización judicial previa sólo es necesaria cuando los padres enajenan o gravan bienes de sus hijos, pero no cuando los hijos lo hacen por cuenta propia.

Esa interpretación es incorrecta. Primero, el Código Civil es claro: *los hijos necesitan el consentimiento de los padres para enajenar o gravar sus bienes.* Segundo, de aceptarse esa interpretación, los padres podrían evadir el requisito

El Art. 159 del Código Civil, *supra*, no señala una sanción concreta por su contravención. De acuerdo con la doctrina, ésta es precisamente la situación en que la nulidad de pleno derecho tiene su efecto sancionador más idóneo. J.R. Bonet Correa, *Los actos contrarios a las normas y sus sanciones*, XXIX (Núms. 1-2) An. Der. Civ. 309, 321 (1976).

No se discute persuasivamente que los menores son sujetos tutelados por el Estado, el cual —en el ejercicio de su poder de *parens patriae*— acuñó la normativa necesaria para la protección de su persona y de sus bienes. El requisito de la *previa* autorización judicial fue el mecanismo del que se valió el legislador para que los menores pudieran disponer lícitamente de sus bienes. Es por esa razón que cuando no media la *imperativa* autorización judicial el acto carece de *validez*. Cuando el contrato se ha celebrado en violación de una *prescripción* o prohibición legal fundada en motivos de orden público, no produce efecto jurídico alguno (*quod nullum est, nullum producit effectum*). Vélez Torres, *op. cit.*, pág. 163.[3]

---

de la aprobación judicial con sólo no comparecer a los actos de enajenación o constitución de gravámenes de sus hijos menores. Se burlaría así toda la política pública que movió al legislador a adoptar la norma.

Debemos ser cautelosos al proponer la adopción de doctrinas de otras jurisdicciones en un asunto tan sensitivo como el derecho de familia. Máxime si son el producto de reformas integrales de sus ordenamientos en respuestas a sus propias circunstancias históricas. Correríamos el riesgo de dislocar nuestro ordenamiento al copiar fuera de contexto, lo que propiciaría inestabilidad e incertidumbre en nuestra sociedad y en los profesionales del derecho.

[3] Aunque en algunos países de tradición civilista se han establecido clasificaciones de los menores (púberes e impúberes), éstas tienen menores consecuencias cuando se trata de asuntos pertenecientes a la esfera patrimonial. En España, por ejemplo, luego que entrara en vigor la Constitución de 1978, se ha efectuado una amplia reforma del Código Civil. Una de las áreas de mayores y profundos cambios es la regulación de la familia. Hoy día se alcanza la mayoridad a los dieciocho (18) años cumplidos. Ya no se habla de manera genérica de los actos de los menores. María del C. Gete-Alonso, por ejemplo, los agrupa de la manera siguiente: "[(1)] Los que pertenecen a la esfera personal-familiar[; (2)] Aquellos que hacen referencia a su situación personal [;(3)] Los que pertene-

## IV

La posición que asumimos no es nueva, sino que sigue nuestro acervo doctrinario. Invariablemente nuestras decisiones han sostenido la *nulidad absoluta* de la obligación principal como de la hipoteca en situaciones de menores de edad, como la que hoy enfrentamos. Así, en *F. Zayas, S. en C. v. Torres*, 51 D.P.R. 796, 799 (1937), dijimos:

> El artículo 159 del Código Civil (1930) provee que el ejercicio de la patria potestad no autoriza al padre ni a la madre para enajenar o gravar los bienes de un menor, *sin previa autorización de la corte de distrito. Parece lógico y justo sostener que si para la constitución de una hipoteca, que es una obligación subsidiaria, sobre bienes de menores, se necesita la autorización previa de la corte de distrito, esa autorización previa debe exigirse también como requisito legal necesario para la validez de la obligación principal que ha de ser garantizada por la hipoteca.* El legislador ha impuesto a las

cen al ámbito negocial patrimonial[, y (4)] Lo[s] que guarda[n] relación con el patrimonio del menor." M. del C. Gete-Alonso y Calera, *La nueva normativa en materia de capacidad de obrar de la persona*, Madrid, Ed. Civitas, 1985, pág. 31.

Pueden apreciarse cambios en asuntos como los derechos de la personalidad, adquisición de la ciudadanía, derecho a ser oídos, prestar consentimiento a la adopción, etc. En la esfera patrimonial pueden observarse *menos* variaciones. *Definitivamente, los actos para los que se necesita autorización judicial son de marcado carácter patrimonial y no personal.*

En relación al patrimonio del menor sometido a patria potestad, la variación más importante ha sido que el hijo mayor de dieciséis (16) años podrá realizar por sí solo *actos de administración ordinaria* respecto de los bienes que hubiera adquirido con su trabajo o industria. Sin embargo, subsiste la *regla general* que exige complemento de capacidad para aquellos actos que excedan este ámbito. Gete-Alonso y Calera, *op. cit.*, págs. 51–54. También existe la posibilidad de legitimar la actuación del titular de la patria potestad (no necesidad de que éste recabe autorización judicial) en relación con los actos de enajenación de su patrimonio siempre que si hubiere cumplido dieciséis años "'consintiere en documento público' (*artículo 166.2 CC*)". Gete-Alonso y Calera, *op. cit.*, pág. 33.

En Colombia existe la categoría de púberes o menores adultos (varones mayores de catorce (14) años y mujeres mayores de doce (12) años, sin exceder de dieciocho (18) años, en uno y otro caso) e impúberes. "Para celebrar negocios jurídicos sobre bienes inmuebles o derechos reales constituidos sobre ellos, los púberes *requieren autorización judicial*, así como su enajenación, limitación gravamen, condiciones resolutorias, la donación, etc." R. Becerra Toro, *Obligaciones Civiles: Fuentes y Formas*, Bogotá, Ed. Temis, 1987, pág. 81.

cortes de distrito la obligación de investigar y convencerse de la necesidad y utilidad, para el menor, de los actos o contratos que han de celebrarse en su nombre, antes de que dichas cortes puedan ejercitar la facultad que la misma ley les confiere para autorizar tales actos o contratos. Véanse artículos 614 a 616 del Código de Enjuiciamiento Civil (1933). Para sostener que el padre y la madre del menor pueden sin la previa autorización de la corte de distrito y sin la previa demostración de su utilidad o necesidad para el menor, tomar cantidades a préstamo y disponer a su arbitrio de dichas cantidades, *y que esas obligaciones nulas ab initio pueden ser convalidadas por una aprobación judicial concedida a posteriori, sería preciso ignorar el espíritu de la ley y la clara intención del legislador, convirtiendo la intervención judicial en una hueca e ineficaz formalidad.* (Énfasis suplido.)

En *Vilariño Martínez v. Registrador*, 89 D.P.R. 598, 601–602 (1963), extendimos esa prohibición *aun a casos no garantizados por hipoteca.* Expusimos:

Se alega por el recurrente que el Art. 159 del Código no proh[í]be a los padres tomar dinero a préstamo a nombre de sus hijos menores bajo su patria potestad, *sin autorización judicial.* Ello es así si nos ceñimos estrictamente a la letra de dicho precepto; pero si consideramos el propósito que ha perseguido el legislador en cuanto a la protección por parte de los tribunales de los intereses de los menores establecida tanto en el referido artículo como en los de procedimiento para obtener autorización sobre los derechos y los bienes de los menores, nos veremos obligados a concluir que *es indispensable y necesaria la previa autorización judicial para que un padre pueda tomar dinero a préstamo a nombre de su hijo menor de edad.* De lo contrario, podrían perjudicarse los intereses de los menores, mediante el procedimiento de sujetar los bienes del menor al pago de obligaciones prestatarias contraídas a su nombre por su padre. En esta forma se podría lograr indirectamente, lo que la ley proh[í]be directa y expresamente. Contraído el préstamo y no satisfecho según convenido, respondería de su pago todos los bienes del prestatario pues como bien apunta el Registrador, el Art. 1811 del Código Civil (31 L.P.R.A. sec. 5171) dispone que "del cumplimiento de las obli-

gaciones responde el deudor con todos sus bienes presentes y futuros". Una venta judicial de bienes del menor en ejecución de la sentencia dictada en su contra, en virtud de la deuda prestataria, priva a dicho menor de sus bienes mediante venta forzosa sin que haya habido una previa determinación judicial sobre la necesidad y utilidad para el menor del negocio realizado a su nombre por su padre y cuyas consecuencias, según hemos ilustrado, son una venta o enajenación forzosa de sus bienes muebles o inmuebles. En esta forma indirecta se logra que el padre venda o enajene bienes inmuebles de su hijo menor sin autorización judicial, en abierta violación del Art. 159 del Código Civil y los ya citados del Código de Enjuiciamiento Civil.

Y más adelante aludimos a la necesidad de cumplir este trámite:

Este caso es ilustrativo de la sabiduría de los preceptos legales que imponen a los tribunales la obligación de investigar y convencerse de la necesidad y utilidad, para el menor, de los actos o contratos que han de celebrarse a su nombre. Asumimos que el padre en este caso ha realizado un negocio, que a su juicio, es útil y conveniente para su hijo. Esta determinación, sin embargo, correspondía a los tribunales y no al padre. Algunas de las preguntas que éste vendría obligado a contestar en un procedimiento de autorización judicial, serían, ¿qué tipo de interés se pactó en el contrato de préstamo? ¿con qué medios cuenta el menor para satisfacer el principal del préstamo en la forma pactada? ¿qué riesgos hay de que el menor no pueda cumplir con esa obligación, y exponga así al cumplimiento de la misma tanto el inmueble adquirido como sus demás bienes, si los tuviere ahora o los que adquiera en el futuro? *Vilariño Martínez v. Registrador*, supra, pág. 603.

Esta interpretación fue refrendada recientemente en *Osorio v. Registrador*, 113 D.P.R. 36, 38 (1982), cuando señalamos que la "afección del inmueble a un *gravamen hipotecario es elemento adicional que justifica la supervisión por el Tribunal Superior de los intereses de[l] menor*". (Énfasis suplido.)

En el caso de autos la hipoteca es nula no sólo por haber incumplido disposiciones de la Ley Hipotecaria y del Registro de la Propiedad, sino también porque su naturaleza subsidiaria impide que pueda subsistir si la obligación principal que se propone garantizar adolece de igual defecto. La situación no se rige —y es completamente distinguible— del contrato de *arrendamiento* presente en *Santos Green v. Cruz*, 100 D.P.R. 9 (1971). Esa decisión no es autoridad para sostener la norma de confirmación en que se funda la opinión concurrente —en el caso de autos— de la Juez Asociada Señora Naveira de Rodón.(4)

Nuestra jurisprudencia más reciente sobre este particular insiste en la necesidad de cumplir con los requisitos sustantivos y procesales atinentes en los actos que afecten los bienes de menores. *Rodríguez Mejías v. E.L.A.*, 122 D.P.R. 832 (1988); *Ferré v. Registrador*, 109 D.P.R. 148, 155 (1979).

En vista de que la autorización judicial *tiene* que ser previa al negocio, y que su falta lo hace radicalmente nulo, es improcedente el enfoque que propugna que el notario López Olmedo obtenga a posteriori la autorización judicial correspondiente.

## V

La actuación consciente del notario querellado López Olmedo contravino toda la normativa jurisprudencial y estatutaria elemental vigente. Por ende, amerita una sanción disciplinaria más rigurosa. Circunscribirla a una simple amones-

---

(4) "[S]i bien es cierto que un contrato hecho a nombre de un menor sin haber obtenido antes la autorización judicial para tal acto, es nulo, puede ser convalidado, confirmado, reconocido o ratificado por la persona a nombre de quien se contrató al llegar éste a su mayoría de edad. Cuando un contrato es así, anulable, si se encuentra ventajoso se puede confirmar, y si no, se puede solicitar su anulación. *Caraballo v. Martínez Ribot*, [96 D.P.R. 812 (1969)]; *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494, 504 (1961); *Monagas v. Vidal*, 170 F.2d 99 (1st Cir. 1948)." *Santos Green v. Cruz*, 100 D.P.R. 9, 16 (1971).

tación no es suficiente. Tiende a debilitar el reclamo de este Foro de fomentar la mejor praxis notarial. Inintencionalmente da la impresión de que, en ausencia de perjuicio, la notaría puede ejercitarse de ese modo. Después de todo, por su gestión precautora, en la notaría, la "obligación en el terreno educativo es todavía mucho más amplia, por cuanto debe referirse a todas las personas que pasan por nuestros despachos, inclu[idas], sobre todo, aquellas a las que hay que decir: '*Esto no se puede hacer*'". J.A. Molleda, *Perfil comunitario de la ética notarial,* LXXXVII Rev. Der. Not. 103, 113 (enero-marzo 1975).

El *juicio de capacidad* de los otorgantes que por el notario presupone el otorgamiento de instrumentos no debiera menoscabarse. Comprende las dimensiones siguientes:

La afirmación de la capacidad del otorgante es un juicio jurídico y psicólogo bastante complejo, pues se apoya en una serie de hechos positivos unos (como la *edad*) y negativos otros (*inexistencia de incapacidad expresa o prohibición*). Además en el actuante hay que mirar no sólo a la aptitud o posibilidad de tenencia de derechos, *sino a la inmediata posibilidad de ejercitarlos por sí mismo.*

Los elementos que han de ser examinados para formular la afirmación de capacidad son los siguientes:

1º. *La capacidad de goce.*

2º. *La capacidad del ejercicio para el acto jurídico de que se trate.*

3º. *La inexistencia de prohibiciones expresas de la Ley.*

4º. *La conciencia libre y la voluntad actual.* La existencia de vicios de la voluntad vicia el acto. Antes de autorizarlo, debe el Notario investigar discreta, pero escrupulosamente, el ánimo de cada uno de los otorgantes para evitar que el instrumento pueda ser posteriormente anulado por la ausencia del consentimiento o vicio del mismo.

5º. *En los casos especiales* . . . . (Énfasis suplido y en el original.) E. Giménez-Arnau, *Instituciones de Derecho Notarial,* Madrid, Inst. Ed. Reus, 1954, T. II, pág. 105.

Merece recordarse que el "'notario, al autorizar una escritura pública, tiene —se dice— cuatro deberes principales: 1. [i]ndagar la voluntad de los otorgantes[;] 2. [f]ormular la voluntad indagada[;] 3. [*i*]*nvestigar ciertos hechos y datos de los que depende la eficacia o validez del negocio*[;] 4. [*d*]*arles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo.*' (Énfasis nuestro.) D. Winfried Kralik, *El deber de informar del notario*, 22 Anales de la Academia Matritense del Notariado, Vol. II, pág. 11 (1982). Sobre el contenido del deber, este mismo autor consigna: que no nace de una obligación del notario con su cliente por medio de un contrato jurídico, ni de la deontología, sino como *deber oficial* 'en el interés de terceros, y por eso no está sometido ni a la disposición del notario ni a la de los otorgantes'. Íd., pág. 15." (Escolio omitido.) *Chévere v. Cátala*, 115 D.P.R. 432, 438 (1984).

En estas circunstancias, nuestra orientación doctrinaria debería reafirmar sin ambages la obligación de todo notario de obtener la autorización judicial correspondiente antes de comprometer bienes de menores. Esa ruta constituye el mecanismo para hacer viable el ejercicio de la función judicial de *parens patriae* a tono con el mandato claro del Art. 159 del Código Civil, *supra*. Al igual que los notarios, los tribunales tenemos la obligación de precaver. Son pertinentes nuestras expresiones en *Cruz v. Central Pasto Viejo, Inc.*, 44 D.P.R. 367, 382 (1933), en ocasión de celebrarse un contrato de transacción que afectaba bienes de un menor sin que mediara aprobación judicial.

La aprobación judicial no es una función mecánica a la cual viene obligado el tribunal después de convenida una transacción por el padre. Cuando el legislador dispuso que la transac-

ción convenida por el padre no surtiría efecto sin la aprobación judicial, quiso significar algo y no realizar un acto inútil e innecesario, carente de fuerza legal. Estas palabras resultan claras y diáfanas, forman parte de la ley, tienen su significación en nuestro idioma, y no pueden ser ignoradas por una decisión judicial.

*Es necesario recalcar que la autorización judicial tiene que ser previa al acto dispositivo.* No exime de responsabilidad al notario el hecho de haberle informado a las partes en el negocio, antes del otorgamiento de las escrituras, la necesidad de solicitar tal autorización. El fiel y mejor desempeño de la función notarial exige que el notario no sólo conozca el derecho sustantivo y adjetivo, sino que lo observe con absoluta rigurosidad.

En virtud de lo expuesto, disentimos de la simple amonestación. Reconociendo que la actuación del notario López Olmedo —aparte de derivar los honorarios correspondientes a dicho otorgamiento— no fue dolosa ni con ánimo de defraudar, le impondríamos una sanción de dos (2) meses de suspensión del ejercicio del notariado. La posible ulterior subsanación de sus actos no enerva ese curso decisorio.

—O—

Opinión concurrente y disidente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se unen el Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Alonso Alonso.

El 28 septiembre de 1987 el Procurador General presentó un informe relacionado con la conducta profesional del abogado-notario Luis A. López Olmedo.[1] No existe controver-

---

[1] Dicho informe se presentó en cumplimiento de nuestra Resolución de 11 de junio de 1987:
"Vista la orden y demás documentos enviados por el Hon. Enrique Rivera

sia en cuanto a los hechos. El propio abogado-notario López Olmedo los expone en comunicación de 24 de agosto de 1987 que sometiera al Procurador General:(²)

> *El 26 de septiembre de 1986 en Guaynabo, Puerto Rico*[,] *el suscribiente autorizó como notario un Pagaré Hipotecario al Portador por $113,000.00* con vencimiento a la presentación, . . . garantizado con hipoteca constitu[i]da sobre un bien inmueble . . . propiedad de los deudores Ida Gómez Viuda de Meléndez, Pablo Raúl Meléndez Gómez e Ida Marie Meléndez Gómez, según se expresa en la escritura [Núm.] 20 de igual fecha, lugar y notario, suscrito mediante affidavit número 3708. *Tanto en el pagaré como en la escritura se hace constar la comparecencia de Pablo Raúl Meléndez Gómez como menor, de 17 años de edad,* siendo las demás comparecientes mayores de edad. *No se obtuvo autorización previa al otorgamiento de la escritura.* Sin embargo, ello fue objeto de discusión con anterioridad a la firma y acto del otorgamiento de la escritura. Se asesoró a los deudores, estando presente la acreedora, en sentido de que era imprescindible solicitar dicha autorización, comprometiéndose la señora Ida Gómez Viuda de Meléndez, madre con patria potestad y custodia, y éste a efectuar los trámites judiciales correspondientes para ello. Los documentos se otorgaron para garantizar una obligación prestataria *pr[ee]xistente y con anterioridad a dicha fecha* de los deudores a la acreedora Gloria Valiente Maldonado[,] . . . es decir, en dicha fecha no hubo entrega de dinero de clase alguna. El documento fue presentado al Registro de la Propiedad y retirado por el suscribiente faltando otros documentos complementarios sobre declaratoria de herederos y planilla de herencia, los cuales no se tenían en el momento de la presentación. (Énfasis suplido.) *Exhibit* I, págs. 2–3.

---

Santana, Juez del Tribunal Superior, Sala de Bayamón, [*Gloria Valiente Maldonado v. Ida Gómez Vda. de Meléndez, etc.,* Civil Núm. CS87-1723 (505); Acción para el perfeccionamiento de escritura y devolución de dinero], se refiere el asunto a la Oficina del Procurador General para que éste realice una investigación sobre el mismo y rinda un [i]nforme a este Tribunal . . . ."

(²) En su informe, el Procurador General no cuestiona esta versión de los hechos; se limita a argumentar los planteamientos de derecho.

En esa misma comunicación fijó su posición:

1. En el momento del otorgamiento el suscribiente estaba plenamente convencido de que actuaba correctamente en derecho.

2. Su criterio rector fue el que aún sin la previa autorización de ley, el acto del menor al obligarse era convalidable, confirmable o ratificable, subsistiendo la obligación constitu[i]da.

3. En el otorgamiento de los citados documentos se ciñó estrictamente a la verdad.

4. El acto no ha causado ni pudo haber causado perjuicio de clase alguna a las partes no habiéndose efectuado reclamo.

5. En su gestión profesional actuó de buena fe.

6. Asumiendo que el suscribiente hubiera cometido un error, el mismo constituye un error razonable de juicio sobre una cuestión jurídica debiéndosele reconocer amplia discreción profesional y no constituyendo [sic] tal acto una violación a sus cánones de ética como abogado-notario. *Exhibit* I, pág. 3.

El 8 de octubre de 1987 le concedimos término al abogado-notario López Olmedo para que mostrara causa por la cual no debía ser disciplinado. Éste ha comparecido y, estando en posición de decidir, así procedemos a hacerlo sin ulteriores trámites.

En su escrito para mostrar, causa el abogado-notario López Olmedo se limita a reiterar los argumentos de derecho que esgrimió en la comunicación que le sometiera al Procurador General. Éstos se pueden resumir así: que la falta de autorización judicial no hacía el acto nulo, sino anulable, ya que podía ser "convalidable, confirmable o ratificable [sic]" por el menor al llegar éste a su mayoría de edad, que en este caso, a lo sumo, lo que hubo fue un error de juicio, y que él se circunscribió a la verdad, actuó de buena fe y no causó perjuicio. Por su parte, el Procurador General alega en su informe que el pagaré hipotecario al portador y la hipoteca en

garantía de dicho pagaré, suscritos por el menor, son nulos.[8]

## I

*La enajenación o gravamen que de sus bienes hacen los menores no emancipados*

Al hablar de enajenación o gravamen de los bienes de los menores de edad, es preciso distinguir entre aquellos contratos celebrados por los menores por sí mismos y los que sus padres otorgan a nombre y en representación de ellos. Los últimos están sujetos a una formalidad que no es necesaria a los primeros. Veamos.

El Art. 159 del Código Civil, según enmendado, 31 L.P.R.A. sec. 616, dispone, en lo pertinente, lo siguiente:

> *El ejercicio de la patria potestad no autoriza a ninguno de los padres para enajenar o gravar bienes* inmuebles de clase alguna, o muebles cuyo valor exceda de dos mil (2,000) dólares, *pertenecientes al hijo,* y que estén bajo la administración de ambos o de cualquiera de ellos, *sin previa autorización de la Sala del Tribunal Superior* en que los bienes radiquen, previa comprobación de la necesidad o utilidad de la enajenación o del gravamen, y de acuerdo con lo dispuesto en la ley referente a procedimientos legales especiales. (Énfasis suplido.)

El citado artículo establece una limitación al ejercicio de la patria potestad por parte de los padres al momento de disponer de aquellos bienes, señalados por el legislador, pertenecientes a los menores de edad: la necesidad de obtener

---

[8] En la escritura hipotecaria compareció el menor Pablo Raúl Meléndez Gómez por sí y, además, aparece su madre con patria potestad y custodia, quien compareció a representarlo. En el pagaré hipotecario compareció el menor por sí. No surge que su madre lo representara en este documento.

autorización judicial previa.(4) La razón para exigir autorización judicial radica en el interés de proteger los bienes pertenecientes a los menores. En este sentido nos señala J.M. Castán Vázquez que:

> La necesidad de asegurar la conservación del patrimonio de los hijos, mientras están sometidos a la patria potestad, aconseja la imposición de ciertas limitaciones legales a los actos de enajenación de los bienes que formen parte de dicho patrimonio. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, 2da ed. rev., Madrid, Ed. Rev. Der. Privado, 1982, T. III, Vol. 2, pág. 227.

Se ha señalado que la autorización judicial previa "no es más que una garantía, una medida cautelar y preventiva; en suma, una limitación legal a las facultades de disposición del titular de la patria potestad, conferidas en tanto [actúe como] representante legal de sus hijos, establecida en beneficio de los mismos". J.M. Suárez Sánchez-Ventura y F. Martínez, *Los actos de disposición de bienes de menores sometidos a la patria potestad en el Código Civil*, 1981 Rev. Der. Priv. 851, 882 (julio-diciembre 1981). Tratándose de bienes inmuebles, la limitación del Art. 159 del Código Civil, *supra*, es absoluta. En cuanto a los bienes muebles, se aplica sólo a aquellos "cuyo valor exceda de dos mil (2,000) dólares . . .". La exigencia de la previa autorización va dirigida expresamente a los padres que, en el ejercicio de su patria potestad, contratan a nombre y en representación de sus hijos menores de edad.(5)

----

(4) Los Arts. 614–616 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2721-2723, establecen el procedimiento a seguir para obtener la "autorización judicial para actos referentes a menores o incapaces o a sus bienes" y el alcance de la sentencia que concede dicha autorización.

(5) Puede plantearse que, a la luz del Art. 4 del Código Civil, 31 L.P.R.A. sec. 4, el no obtener los padres la previa autorización judicial, según lo establece el Art. 159 (31 L.P.R.A. sec. 616), hace nulo el acto de gravamen o enajenación de

Una lectura detenida del Art. 159 del Código Civil, *supra*, nos lleva a concluir que ningún contrato otorgado por un menor de edad por sí mismo tiene que cumplir el trámite de la autorización judicial previa.

La autorización, como vimos, se le exige únicamente a los padres con patria potestad. *El problema con los menores es de consentimiento y no de autorización.* Aquellos contratos otorgados por menores de edad que no tengan suficiente uso de razón y capacidad para discernir se consideran inexis-

---

bienes de un menor por no cumplir con lo dispuesto en la ley. Sin embargo, esta visión, que responde a una aplicación rígida del derecho, ha ido evolucionando para dar paso a otra más dinámica que atempera las exigencias legales a los cambios que paulatinamente se operan en nuestra sociedad.

En este sentido, la S. de 19 de octubre de 1944, Núm. 1176, del Tribunal Supremo de España estableció que:

". . . el artículo 4.º, aparte de que se limita a formular un principio jurídico de gran generalidad . . . no ha de ser interpretado con criterio rígido sino, como sugiere la doctrina científica, con criterio flexible y teniendo en cuenta que no es preciso que la validez de los actos contrarios a la Ley sea ordenada de modo expreso y textual, sin que quepa pensar que toda disconformidad con una ley cualquiera o toda omisión de formalidades legales, que pueden ser meramente accidentales con relación al acto de que se trate, haya siempre de llevar consigo la sanción extrema de la nulidad . . . ." (Énfasis en el original suprimido.) XI Repertorio de Jurisprudencia 664, 665.

Véanse además: S. de 8 de abril de 1958, Núm. 1467, XXV Repertorio de Jurisprudencia 949–950; S. de 27 de abril de 1970, Núm. 2046, XXXVII Repertorio de Jurisprudencia 1384–1385. M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1978, T. I, pág. 111.

El hecho de que no se obtenga la autorización judicial previa no conlleva que, sin más, el acto jurídico efectuado sea siempre nulo o inexistente.

Algunos casos resueltos por este Tribunal podrían prestarse para crear dudas con respecto a lo antes expuesto. Sin embargo, un análisis de los mismos nos lleva a concluir que son distinguibles. *Cruz v. Central Pasto Viejo, Inc.*, 44 D.P.R. 367 (1933); *F. Zayas, S. en C. v. Torres*, 51 D.P.R. 796 (1937); *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494 (1961); *Vilariño Martínez v. Registrador*, 89 D.P.R. 598 (1963); *Ferré v. Registrador*, 109 D.P.R. 148 (1979); *Osorio v. Registrador*, 113 D.P.R. 36 (1982); *Rodríguez Mejías v. E.L.A.*, 122 D.P.R. 832 (1988).

A tono con lo aquí expresado, en su comentario al Art. 164 del Código Civil español, hoy Art. 166 (equivalente al Art. 159 nuestro, *supra*), Manresa señala que "[l]a aprobación judicial de una transacción, con fecha posterior a la misma, subsana la falta de autorización judicial previa. (Sentencia de 10 de abril de 1908 y Resolución de 28 de agosto de 1913)". J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. II, pág. 62.

tentes por carecer totalmente de consentimiento. Sin embargo, los otorgados por menores de edad suficiente como para tener uso de razón y "capacidad" para discernir no son nulos sino meramente anulables. En este sentido Puig Brutau nos señala lo siguiente:

> Las dudas que puedan suscitar los contratos celebrados por menores de edad han de resolverse, según lo que antes hemos visto, teniendo en cuenta que, como dice CASTÁN, "siempre que se trate de menores que tengan uso de razón, el contrato es anulable y no inexistente, porque una cosa es la falta de consentimiento y otra el consentimiento viciado". (Énfasis suplido.) J.M. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1978, T. II, Vol. I, págs. 332–333.

Al analizar los problemas suscitados en relación con el consentimiento para contratar, debemos acudir a lo dispuesto en nuestro ordenamiento.

El Art. 1215 del Código Civil, 31 L.P.R.A. sec. 3402, enumera las personas que no pueden prestar consentimiento para contratar, entre éstos incluye a "[l]os menores no emancipados". En relación con las incapacidades para contratar que establece el Código Civil, el tratadista Castán Tobeñas nos advierte que éstas no deben confundirse con las prohibiciones para contratar:

> Las incapacidades son restricciones de la capacidad de obrar o capacidad de ejercicio. Se fundan, pues, en circunstancias subjetivas de ciertas personas que obligan a la ley a retardar o suspender por un cierto tiempo, o tiempo indefinido, la aptitud para realizar actos jurídicos, remediando entre tanto su defecto de capacidad con instituciones o medios supletorios y complementarios. Las prohibiciones (mal llamadas, por la generalidad de los autores, incapacidades especiales) están fundadas más bien en razones de moralidad. Las primeras restringen el ejercicio del derecho; las segundas, el goce, el derecho mismo. (Énfasis suplido.) J. Castán Tobeñas, Derecho civil español común y foral, 11ma ed. rev., Madrid, Ed. Reus, 1974, T. III, pág. 447.

Por su parte, Manresa y Navarro clasifica las incapacidades que establece el Código Civil en dos (2) categorías: las *naturales*, que "se fundan en la falta de aptitud real para consentir, como la locura y la sordomudez", y las *legales*, en las que "la plena capacidad psíquica del individuo aparece limitada por razones de orden familiar, principalmente por consideración a otros derechos que podrían perturbar el libre ejercicio de aquélla . . . . *En cuanto a la incapacidad de los menores, su fundamento, y por tanto su grupo, varía según la edad y el consiguiente desarrollo*". (Énfasis suplido.) Continúa exponiendo que: "[L]a incapacidad legal suele ser relativa, según que tropiece o no con los derechos en consideración a los cuales se establecen las limitaciones . . . . La falta de consentimiento del menor, no produce la inexistencia absoluta como la que origina la incapacidad de los locos y sordomudos, habiendo declarado la jurisprudencia en doctrina reiterada, *que al no existir precepto legal alguno que impida a los mayores de edad la ratificación de los contratos o negocios jurídicos celebrados en el momento de su perfección por persona que fuere menor, pueden los menores ratificar los contratos celebrados una vez llegado a la mayoría de edad, ya de manera expresa, o bien tácitamente dejando pasar el plazo de cuatro años que el Código civil señala para el ejercicio de la acción de nulidad.*" (Énfasis suplido.) J.M. Manresa y Navarro, *Comentarios al Código Civil español*, Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, págs. 537–539.

Puig Brutau, a su vez, citando a Luna, expresa que la regla para proteger a los menores, establecida en el Art. 1263 del Código Civil español, que equivale al Art. 1215 nuestro, *supra*, no "'comporta que los contratos llevados a cabo por el menor de edad sean completamente nulos, ya que sólo pueden ser objeto de anulación a petición de las personas

legitimadas para ello'". Puig Brutau, *op. cit.*, pág. 45. Cónsono con la doctrina expuesta, en varias ocasiones hemos declarado válidos los contratos otorgados por los menores de edad que han representado ser mayores, representación que llevó a las otras partes a confiar en dichos menores y a contratar con ellos como si fueran mayores de edad.[6] De otra parte, Díez-Picazo nos indica que "[l]a anulabilidad es medida protectora del que ha sufrido un vicio en su voluntad de contratar, o del que contrata siendo así que posee una capacidad de obrar restringida (menor . . .)". L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 121.

El Art. 1253 del Código Civil, 31 L.P.R.A. sec. 3512, dispone que el término prescriptivo para ejercer la acción de nulidad de los contratos celebrados por menores es de cuatro (4) años contados desde que salieron de la tutela,[7] y el Art. 1254 del Código Civil, 31 L.P.R.A. sec. 3513,[8] indica quiénes pueden ejercitar dicha acción.

Por otra parte, cabe señalar que todo negocio jurídico que dependa de su inscripción en el Registro de la Propiedad para quedar constituido será nulo si se incumple con tal re-

---

[6] En este sentido, véanse los casos siguientes: *Del Valle Ríos v. González*, 94 D.P.R. 463, 467 (1967); *Delgado v. Marchese*, 44 D.P.R. 281, 295 (1932); *Sucesión Rivera v. Hernández et al.*, 31 D.P.R. 813, 818–819 (1923).

[7] El Art. 1253, en su parte pertinente, dispone:

"La acción de nulidad sólo durará cuatro (4) años.

"Este tiempo empezará a correr:

. . . . . . . . .

"y cuando se refiera a los contratos celebrados por los menores o incapacitados, desde que salieren de tutela." 31 L.P.R.A. sec. 3512.

[8] El Art. 1254 del Código Civil dispone:

"Pueden ejercitar la acción de nulidad de los contratos los obligados principal o subsidiariamente en virtud de ellos. Las personas capaces no podrán, sin embargo, alegar la incapacidad de aquellos con quienes contrataron; ni los que causaron la intimidación o violencia, o emplearon el dolo o produjeron el error, podrán fundar su acción en estos vicios del contrato." 31 L.P.R.A. sec. 3513.

quisito.(⁹) Esto es así también cuando es otorgado por un menor con edad suficiente para discernir. Más adelante haremos referencia a este asunto en particular.

Surge la dificultad consistente en determinar la edad a la cual un menor tiene suficiente uso de razón como para otorgar un contrato mediante el cual enajene o grave sus bienes.

Algunas jurisdicciones utilizan los términos "púberes" o "impúberes" como lindero de uso de razón o falta de ella en los menores de edad. Así por ejemplo, en Chile se han establecido las edades de catorce (14) años para el varón y doce (12) para las mujeres. En relación con este asunto, el tratadista Avelino León Hurtado nos indica lo siguiente:

> . . . Son también absolutamente incapaces los impúberes, o sea, "el varón que no ha cumplido catorce años y la mujer que no ha cumplido doce" (art. 26). La ley presume de derecho que un impúber carece de juicio suficiente por falta de desarrollo mental.
>
> La diferencia que se establece entre el hombre y la mujer viene del Derecho Canónico y corresponde a los distintos períodos en que se considera adquirida la madurez sexual.
>
> Los actos de los impúberes son absolutamente nulos (art. 1.682, inc. 2º.), no producen ni siquiera obligaciones naturales y no admiten caución (art. 1.447, inc. 2º.). (Escolio omitido.) A. León Hurtado, *La voluntad y la capacidad en los actos jurídicos*, 2da ed., Santiago, Ed. Jur. de Chile, 1963, pág. 400.

En Colombia se le da igual tratamiento en término de la presencia o ausencia de capacidad para contratar. Según indica José Ramón Ortega, "[l]a capacidad de ejercicio sí tiene limitaciones y están enumeradas en el artículo 1504 del Có-

---

(⁹) En cuanto a las hipotecas, el Art. 182 de la Ley Hipotecaria y del Registro de la Propiedad de 1979 (30 L.P.R.A. sec. 2601) establece lo siguiente:

"Son hipotecas voluntarias las convenidas entre partes o impuestas por disposición del dueño de los bienes o derechos sobre que se constituyan y únicamente podrán ser establecidas por quienes tengan la libre disposición de dichos bienes o derechos o, en caso de no tenerla se hallen autorizados para ello con arreglo a las leyes."

digo Civil [colombiano]. Se les niega capacidad a los dementes, a los impúberes y a los sordomudos que no pueden darse a entender por escrito. *Cualquier acto celebrado por alguna de estas personas es nulo, produce nulidad absoluta. Producen nulidad relativa, según el mismo artículo, por ser incapaces, los menores adultos que no han obtenido habilitación* [sic] *de edad".*(10)(Énfasis suplido.) J.R. Ortega, *Nulidades civiles en el derecho colombiano*, 2da ed., Bogotá, Ed. Temis, 1977, pág. 24.

En Puerto Rico no se ha establecido estatutariamente una distinción, a base de edades, entre los menores que carecen totalmente de uso de razón y los que tienen capacidad para discernir, los llamados "menores adultos". Está fuera del ámbito de la competencia de este Tribunal determinar una edad específica para establecer dicha distinción. Ese asunto le corresponde dirimirlo en su día, de creerlo pertinente, a la Asamblea Legislativa. Mientras así sucede, y para resolver las controversias que puedan llegar a la atención de este Tribunal, debería tomarse en consideración la totalidad de las circunstancias de cada caso en particular para determinar la ausencia o presencia de capacidad para contratar.

El menor de las postrimerías del siglo veinte (XX) no es ni remotamente el menor contemplado por el legislador decimonónico al adoptar para Puerto Rico el vigente Código Ci-

---

(10) El Art. 1504 del Código Civil colombiano preceptúa lo siguiente:

"Son absolutamente incapaces los dementes, los impúberes y sordomudos, que no pueden darse a entender por escrito.

"Sus actos no producen ni aun obligaciones naturales y no admiten caución.

"Inc. 3o.-*Modificado. Decr. 2820 de 1974, art. 60*-Son también incapaces los menores adultos que no han obtenido habilitación de edad y los disipadores que se hallen bajo interdicción. Pero la incapacidad de estas personas no es absoluta y sus actos pueden tener valor en ciertas circunstancias y bajo ciertos aspectos determinados por las leyes.

"Además de estas incapacidades hay otras particulares que consisten en la prohibición que la ley ha impuesto a ciertas personas para ejecutar ciertos actos." *Código Civil*, 17ma ed., Bogotá, Ed. Temis, 1984, pág. 634.

vil. Contrario al menor del siglo diecinueve (XIX), el de hoy día tiene accesos, antes insospechados, a la instrucción a través del desarrollo tecnológico, especialmente en el área de las comunicaciones. Esto desemboca en la inevitable realidad de que el menor de nuestros días tenga un grado superior de capacidad y discernimiento, comparado con el que pudo tener el menor del siglo anterior e incluso, el de los primeros decenios del actual.

Lamentablemente, la evolución del proceso legislativo no ha seguido el desarrollo de nuestra sociedad en el ámbito tecnológico que, a su vez, implica transformaciones en el campo de lo valorativo. El derecho positivo ha quedado rezagado en muchas áreas que inciden en la vida de nuestra sociedad. Así sucede, por ejemplo, en lo atinente a los menores, sobre todo en materia del derecho privado.

*El caso de autos no versa sobre un contrato otorgado por los padres o un representante del menor a su nombre y sin su conocimiento en cuanto al pagaré hipotecario al portador se refiere.* Estamos ante el caso de un menor de diecisiete (17) años de edad, quien ciertamente debe tener más capacidad que uno de edad más tierna, y quien comparece personalmente a firmar el pagaré hipotecario con conocimiento de su actuación. No padece de defecto mental alguno y el notario López Olmedo le explicó las consecuencias del negocio jurídico del cual es parte. Tenía capacidad suficiente para discernir en cuanto a la conveniencia del contrato que firmó.

A la luz de lo antes expuesto, podemos concluir que, si bien es cierto que el hecho de que el menor haya comparecido personalmente a firmar dicho contrato no subsana el defecto del vicio del consentimiento debido a su minoridad, también es cierto que este defecto no implica que el contrato sea nulo ab initio, sino meramente anulable y, por lo tanto, sujeto a una posterior confirmación tan pronto cese la incapacidad del menor. En caso de que el menor no haya alcan-

zado su mayoridad, sus padres pueden confirmar el contrato por él. Puig Brutau, *op. cit.*, pág. 45.

## II

*La necesidad de inscribir una hipoteca en el Registro de la Propiedad*

Antes de comenzar a analizar este punto en particular, debemos recordar lo siguiente:

La distinción del notario de tipo latino a la de otro tipo de notario es importante por la función que ha ejercido y que ejerce aquél en la sociedad. *En el notario puertorriqueño se funden dos facetas esenciales en la administración de la justicia, tanto en su función como profesional o técnico conocedor del Derecho como en su carácter de funcionario público. Ante su fe notarial se crean los derechos que emanan del tráfico jurídico de los bienes inmubles.*

En esa función el notario puertorriqueño no es abogado de ninguno de los otorgantes, no representa a cliente alguno, representa a la fe pública, representa la ley para todas las partes. *La cualidad medular que lo distingue del abogado es su imparcialidad, y en tal condición debe actuar en un plano superior al de las partes.*

Es de vital importancia, pues, la elevación del nivel de capacitación jurídica del notario y su dignificación por la importante función social que despliega en interés de la comunidad puertorriqueña, *en esa doble función de profesional del Derecho como asesor y consejero legal, árbitro de la ley, así como en la de instrumentador de los documentos que conllevan los actos y negocios jurídicos a los cuales les da seguridad y certeza con su pericia profesional y bajo el manto de la fe pública de la cual es depositario.* (Énfasis suplido.) Exposición de Motivos de la Ley Notarial de 1987, Ley Núm. 75 de 2 de julio de 1987, Leyes de Puerto Rico de 1987, págs. 262–263.

Como "profesional o técnico conocedor del derecho", el abogado-notario López Olmedo sabía que la hipoteca que otorgó era nula y que no se podía inscribir, pues por imperativo de la Ley Hipotecaria y del Registro de la Propiedad

debió haberse obtenido la autorización judicial correspondiente. Art. 182 de la Ley Hipotecaria y del Registro de la Propiedad, Ley Núm. 198 de 8 de agosto de 1979 (30 L.P.R.A. sec. 2601). También era consciente que "la garantía de un crédito personal no se constituye en garantía real —hipoteca— hasta que es inscrita en el Registro". *Rosario Pérez v. Registrador*, 115 D.P.R. 491, 493 (1984). El Art. 1774 del Código Civil dispone:

> Además de los requisitos exigidos en la sec. 5001 de este título es indispensable, para que la hipoteca quede válidamente constituida, que el documento en que se constituya sea inscrito en el registro de la propiedad. 31 L.P.R.A. sec. 5042.

Véanse, además: *J. Credit, Inc. v. Ramírez*, 113 D.P.R. 181 (1982); *Liechty v. Descartes Saurí*, 109 D.P.R. 496 (1980); *Gaztambide v. Sucn. Ortiz*, 70 D.P.R. 412 (1949); *Beiró v. Vázquez*, 52 D.P.R. 601 (1938); J. Puig Brutau, *Fundamentos del Derecho Civil*, 2da ed., Barcelona, Casa Editorial Bosch, 1974, T. III, Vol. III, pág. 61; J.L. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho Inmobiliario Registral*, Barcelona, Librería Bosch, 1968, pág. 131 y ss.

El Art. 188 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2607, a su vez dispone:

> Para que las hipotecas voluntarias queden válidamente constituidas se requiere:
> Primero: Que se hayan acordado en escritura pública.
> Segundo: Que la escritura se haya inscrito en el Registro de la Propiedad.

En reiteradas ocasiones hemos dicho que "[l]a función del notario trasciende el acto externo de la legalización de unas firmas". *In re Meléndez Pérez*, 104 D.P.R. 770, 775 (1976); *In re Ramos Meléndez y Cabiya Ortiz*, 120 D.P.R. 796 (1988). El notario que autoriza una hipoteca no puede hacer caso omiso de un hecho que hace que el documento que está otorgando no pueda inscribirse en el Registro de la Propiedad,

ya que si no se puede inscribir, no se está constituyendo en realidad una hipoteca. El hecho de que los otorgantes insistan en que bajo estas condiciones el notario otorgue "una hipoteca", no justifica el que éste acceda a tal solicitud. Después de todo, el notario no es abogado de los otorgantes, no representa a cliente alguno, su deber es para con la fe pública y representa la ley para todas las partes.

## III

*Conclusión*

El contrato principal (Pagaré Hipotecario al Portador) autorizado por el licenciado López Olmedo es meramente anulable y sujeto a la confirmación del menor Pablo Raúl Meléndez Gómez al llegar a la mayoridad, o si aún es menor de edad, por sus padres con la previa autorización judicial. No así la escritura de Hipoteca en Garantía del Pagaré al Portador que, de acuerdo con lo antes expresado, es completamente nula y carente de impacto registral.

A tenor con las normas de derecho y ética que hemos reseñado, no cabe duda que el abogado-notario López Olmedo no actuó con el debido cuidado y rigor al ejercer la función notarial. Los hechos, sin embargo, también demuestran que no medió de su parte mala fe ni intención de engañar, que no hubo ánimo de lucro personal en la conducta objeto del informe, que en los documentos otorgados se hizo constar la verdad, y que las partes no han sufrido perjuicio.[11]

Tomando en consideración todas estas circunstancias atenuantes, estamos de acuerdo con la sentencia que amonesta al abogado-notario López Olmedo y le apercibe que en el fu-

---

[11] En su informe, el Procurador no nos indica que alguna de las partes se hubiese perjudicado ni contradice la aseveración hecha por el abogado-notario López Olmedo a esos efectos.

turo deberá observar con mayor rigor los preceptos notariales. *In re Ramos Meléndez y Cabiya Ortiz*, supra. Además, le ordenaríamos que, de confirmarse el contrato principal, autorice una nueva escritura de constitución de hipoteca libre de defectos que impidan su inscripción en el Registro de la Propiedad.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton.

Endoso la sentencia del Tribunal que limita la sanción disciplinaria del notario López Olmedo a una amonestación. Sin embargo, por entender que la ausencia de autorización judicial en un contrato en que se graven bienes inmuebles de un menor es nulo y no meramente anulable, entendemos que no se puede ordenar al notario autorizar una nueva escritura de constitución de hipoteca libre de defectos que impidan su inscripción en el Registro de la Propiedad.

I

La Sra. Ida Gómez Vda. de Meléndez suscribió un pagaré garantizado por hipoteca constituida sobre una finca que le pertenecía a ella en común pro indiviso con sus dos (2) hijos. Uno de ellos era menor de edad al momento del otorgamiento. Por esta razón, operaba la disposición del Art. 159 del Código Civil, 31 L.P.R.A. sec. 616, que le prohíbe a los padres enajenar o gravar bienes inmuebles de un menor sin autorización judicial *previa.*

En nuestro ordenamiento, un contrato celebrado en contravención de una prohibición expresa de la ley es nulo y no meramente anulable. Art. 4 del Código Civil, 31 L.P.R.A. sec. 4. *Simonet v. Igaravídez*, 90 D.P.R. 1, 8 (1964); *Rubio Sacarello v. Roig*, 84 D.P.R. 344, 350 (1962); *Corporación Azucarera v. Junta Azucarera*, 77 D.P.R. 397, 409–410 (1954);

L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 301. Por esta razón, discrepamos de la afirmación que hace la opinión concurrente de la Juez Asociada Señora Naveira de Rodón, pág. 281, en el sentido de que "[e]l problema con los menores es de consentimiento y no de autorización". (Énfasis suprimido.)

Independiente de la falta de capacidad para consentir que tienen los menores, cuando el contrato es celebrado en contra de una prohibición de ley, éste es nulo ipso jure. Poderosas consideraciones de orden público hacen indispensable que la autorización judicial requerida por ley sea previa a la enajenación o gravamen de los bienes inmuebles del menor. Así se protege efectivamente el patrimonio de los menores y se evita que una decisión a corto plazo menoscabe sus intereses económicos. Véase M. Albaladejo, *Comentarios al Código civil y compilaciones forales*, 2da ed. rev., Madrid, Ed. Rev. Der. Privado, 1982, T. III, Vol. II, págs. 227–228. Sólo cuando los padres del menor demuestren a satisfacción del tribunal que es necesario y conveniente para el menor enajenar o gravar el bien inmueble es que el tribunal autorizará la celebración del contrato.

Permitir que los padres del menor obtengan la autorización judicial después de celebrado el contrato podría ser perjudicial tanto para el menor como para quien contrate con él. No olvidemos que el menor podría perder el bien inmueble si el acreedor hace efectiva su garantía antes de que el tribunal autorice el negocio. Por otro lado, el tribunal podría convencerse, con posterioridad a la celebración del contrato, que éste es perjudicial para los intereses del menor y denegarlo.

Concluido que la escritura autorizada por el notario López Olmedo es nula, resulta improcedente ordenarle que autorice otra libre de defectos que impidan su inscripción en el

Registro de la Propiedad. El defecto que actualmente impide la inscripción de la escritura no es uno que el notario pueda corregir, porque no está en sus manos conceder la autorización. El notario tiene la obligación de recibir e interpretar la voluntad de las partes y plasmarla en un documento que sea válido para todos los efectos legales. Art. 2 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2002. En consecuencia, su intervención en el negocio jurídico como funcionario público y abogado de todas las partes requería que él le informara a las partes que era preciso obtener la autorización judicial antes de autorizar la escritura de préstamo garantizado con hipoteca. Sin embargo, en última instancia, es el Tribunal Superior, luego de evaluar la necesidad y conveniencia de la transacción para los intereses del menor, quien tiene la facultad de conceder o denegar la autorización correspondiente.

Por lo expuesto anteriormente, entendemos que el notario López Olmedo actuó incorrectamente. Como no se había obtenido la autorización judicial, él debió negarse a autorizar la escritura. Sin embargo, en vista de que no hubo perjuicio para ninguna de las partes y de que la actuación del notario descansó en una interpretación del derecho sobre la que no hay unanimidad de criterios en este Foro apelativo, concurrimos en limitar la sanción disciplinaria a una amonestación.